**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Nathan L. HILL and Cordell James,**
**Defendants–Appellants.**

**Nos. 99–3932, 99–3951.**

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 2001.

Decided June 5, 2001.

Steven W. Myhre (argued), Office of the U.S. Atty., Chicago, IL, for United States.

David B. Mote (argued), Office of the Federal Public Defender, Springfield, IL, for Nathan L. Hill.

Rene R. Pengra (argued), Greg Robbins, Sidley & Austin, Chicago, IL, for Cordell James.

Before POSNER, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

Cordell James and Nathan Hill have been sentenced to life imprisonment. James, who was convicted of a single count of conspiring to distribute drugs, see 21 U.S.C. § 846, drew his sentence because of a combination of his criminal record, the scale of the operation (more than a ton of cocaine), and his participation in the murder of Robert Franklin. Hill received a life sentence (and a fine exceeding $8 million) for operating a continuing criminal enterprise, among other crimes. See 21 U.S.C. § 848.

■ 1. Both defendants contend that their sentences violate the due process clause because the jury did not conclude that the evidence establishes beyond a reasonable doubt the events that led to the life terms. See *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). But *Apprendi* does not help Hill, because the maximum sentence for *every* person convicted of violating § 848 is life. He insists that *Apprendi* governs proof of events that determine the minimum lawful sentence, but we rejected that contention in *United States v. Smith*, 223 F.3d 554, 562–66 (7th Cir.2000). Although *United States v. Flowal*, 234 F.3d 932, 936–38 (6th Cir.2000), is at odds with *Smith* (of which the sixth circuit apparently was unaware), we have previously declined to reconsider the holding of *Smith* and do not find in *Flowal* any reason to do so. See *United States v. Hoover*, 246 F.3d 1054, 1058 (7th Cir.2001); *United States v. Williams*, 238 F.3d 871, 876–77 (7th Cir. 2001). *Flowal* does not discuss *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), which held that judges may find, by a preponderance, facts that trigger mandatory minimum penalties. *Apprendi* did not overrule *McMillan*, see 530 U.S. at 487 n. 13, 120 S.Ct. 2348, yet, unless *McMillan* is to be discarded, *Flowal* and its successors, see *United States v. Ramirez*, 242 F.3d 348 (6th Cir.2001); *United States v. Strayhorn*, 250 F.3d 462 (6th Cir.2001), cannot be correct. The sixth circuit is a minority of one, while *Smith* has the support of at least four other circuits—if any support on top of *McMillan* were required. See *United States v. Harris*, 243 F.3d 806 (4th Cir.2001); *United States v. Robinson*, 241 F.3d 115, 122 (1st Cir.2001); *United States v. Keith*, 230 F.3d 784, 787 (5th Cir.2000);

*United States v. Aguayo–Delgado*, 220 F.3d 926, 934 (8th Cir.2000).

■ James has a stronger claim in principle, because any sentence over 30 years depends on finding that a defendant with a prior drug felony conviction (which James has) conspired to distribute at least 5 grams of crack or 500 grams of cocaine hydrochloride. See 21 U.S.C. § 841(b)(1)(B). But James did not ask at trial that the drug-quantity issue be submitted to the jury, and he cannot establish plain error given the volume of cocaine he and his confederates distributed. By convicting him, the jury evinced its finding that James agreed to distribute more than the statutory threshold. James's contention that he wasn't lawfully convicted of the extensive conspiracy charged in the indictment because, after *Apprendi*, each quantity level is a separate offense, was rejected in *United States v. Brough*, 243 F.3d 1078, 1079–80 (7th Cir.2001). There is just one drug-distribution offense, defined by § 841, and one drug-conspiracy offense, defined by § 846. Quantity affects sentencing but does not create separate crimes. (Otherwise someone like James could be convicted of three conspiracies for the same agreement and course of conduct, with each conviction representing the next plateau of drugs sold-or maybe of six conspiracies, if the organization distributed both cocaine and heroin, or nine conspiracies if it added marijuana to the inventory.)

■ 2. The district judge declined to give Instruction 1.09 from the *Federal Criminal Jury Instructions of the Seventh Circuit* (1999). This instruction reads:

> You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

Hill called only two witnesses, including himself, and James called none, so there was an imbalance in the number of witnesses presented. (The trial lasted seven weeks, and the prosecution had plenty of witnesses.) Defendants seek a new trial at which this instruction will be given.

■ The premise of defendants' argument is that every instruction in *Seventh Circuit Federal Jury Instructions: Criminal* must be given on request. That misunderstands the function of a pattern book. It offers model instructions for occasions when they are appropriate but does not identify those occasions; the need for an instruction must be determined independently. An instruction such as 1.09 might be called for if one side's lawyer argued that his client should prevail because he produced more witnesses. Then the judge should tell the jury, perhaps along the lines of Instruction 1.09, that this is not true, that quality of evidence counts more than quantity. No one in this case made a quantity-over-quality pitch, however, so there was no need for an antidote.

Even when a lawyer tries to mislead jurors about the significance of how many witnesses have testified, Instruction 1.09 leaves something to be desired: reasons. It tells jurors that they "may" do one thing and "need not" do the opposite, but that just states the obvious. *Of course* jurors "may" find the testimony of a single witness more persuasive. Any juror who did not think that to begin with is unfit to serve. When *should* jurors find the testimony of one witness more persuasive? That's what matters, and Instruction 1.09 does nothing to furnish the answer. The underlying principle is that quality alone should govern the verdict; ten weasels are no more persuasive than one. That's a thought that district judges could convey directly—though again the point is obvious, so usually it is best left to the jurors' good sense. Why insult jurors' intelligence?

■ Jury instructions tend to be long and full of tedious boilerplate. When the judge emulates Polonius and recites gravely what jurors already know, their attention may wander and they could miss something that really matters. It is best to keep the instructions concise, which is achieved by omitting nostrums and leaving inferences to arguments of counsel. *United States v. Sblendorio*, 830 F.2d 1382, 1392–94 (7th Cir.1987). Unless it is necessary to give an instruction, it is necessary not to give it, so that the important instructions stand out and are remembered. Instructions that include reasons are those most likely to make the cut for utility. See *United States v. Cook*, 102 F.3d 249, 251–52 (7th Cir.1996); *United States v. Austin*, 215 F.3d 750, 752 (7th Cir.2000). For example, the Federal Judicial Center's *Pattern Criminal Jury Instructions* (1987) include the advice not to "make any decisions simply because there were more witnesses on one side than on the other" as part of a more comprehensive instruction (No. 23) labeled "General Considerations in Evaluating Witnesses' Testimony". This instruction reminds jurors of several features that make testimony stronger and treats the quantity advice as a corollary to the principle that quality matters. Instruction 1.09 is less useful. Because nothing hindered the parties from covering this point in closing arguments if they deemed it important, the omission was sensible.

3. With the aid of standby counsel, both defendants represented themselves at trial. James (but not Hill) contends on appeal that he was deprived of the assistance of counsel guaranteed by the sixth amendment. To any person not steeped in the intricacies of criminal practice, this contention would be unintelligible. James made enough money from his activities to afford a lawyer, but when he pleaded poverty the court appointed one for him. Counsel represented James diligently until shortly before trial, when James decided that counsel had not performed to his (unrealistic) expectations and demanded a different lawyer. After the district judge told James that he would not appoint another counsel at public expense (especially when a change of lawyers likely would delay the trial), James decided to go it alone. The judge threw cold water on this proposal, but James persisted, and the judge allowed James to conduct his own defense. Even then, the judge insisted that James's former lawyer remain in court as standby counsel to provide assistance on request. How could someone who had, but then fired, a competent lawyer—and who enjoyed full access to the services of that lawyer throughout the trial, and could have used them on discovering that the intricacies of trial were too much for a high school dropout—contend that he has been "deprived" of his constitutional right "to have the Assistance of Counsel for his defence"?

■ No one could doubt that James acted voluntarily. The judge and prosecutor did not threaten him with sanctions if he elected the assistance of counsel, and he did not choose self-representation as the only way to be rid of an ineffective lawyer. What gives some color to James's position, however, is the proposition that, for a right as important as counsel, voluntariness is not enough. The decision must meet the standards of waiver—which means that it must be knowing and intelligent. See, e.g., *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), referring with approval to *Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Usually the difference between voluntariness and waiver is demonstrable knowledge of the right being surrendered and a formal decision to forego that right. Compare *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041,

36 L.Ed.2d 854 (1973) (holding that a consent to search is voluntary if uncoerced, even though the suspect has not been told of a right to say no), with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding that during custodial interrogation waiver of the privilege against compulsory self-incrimination is possible only if the suspect is told explicitly of certain entitlements).

Waiver does not depend on astute (or even rudimentary) understanding of how rights can be employed to best advantage. Defendants routinely plead guilty, waiving oodles of constitutional rights, in proceedings where the rights are named but not explained. For example, the judge will tell the defendant that the plea waives the right to a jury trial but will not describe how juries work, when they are apt to find a prosecutor's case insufficient, why the process of formulating and giving jury instructions creates issues for appeal, and so on. Judges will mention the right to confront one's accusers without describing how cross-examination can be used to undermine a witness's testimony. One could say that without such details the defendant's choice is "unintelligent," but that would impose unrealistic demands on the judicial system (and impute an unrealistic degree of knowledge to a monosyllabic answer to the query "Do you understand all that?"). It is enough that the judge not *mis*-inform the parties about the legal requirements. See *Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). James does not say that he was misinformed about his entitlements. Proceedings where guilty pleas are taken are subject to the requirement that all waivers be knowing and intelligent, see *Boykin v. Alabama*, 395 U.S. 238, 243–44, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), so if the right-naming (but not right-explaining) protocol under Fed.R.Crim.P. 11 suffices (as it does) for waiver of jury trial and confron-

tation, then a similar approach should suffice for waiver of the right to counsel.

The contention that "knowing and intelligent" means something different when a defendant elects self-representation than when the same defendant elects a bench trial (or waives another constitutional right) has its genesis in *Faretta*, which held that the Constitution gives defendants a right to be free of unwanted legal services at trial. (And only at trial. See *Martinez v. Court of Appeal*, 528 U.S. 152, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000).) *Faretta* constitutionalized, and thus extended to the states, an entitlement long recognized in federal courts by virtue of statute. See 28 U.S.C. § 1654. Toward the end of its opinion in *Faretta* the Court remarked, 422 U.S. at 835, 95 S.Ct. 2525: "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open' ", quoting from *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

From this statement of preference ("should" is not "must") has grown a jurisprudence demanding more and more extensive advice and warnings to impress on the defendant the drawbacks of dispensing with counsel. E.g., *United States v. Avery*, 208 F.3d 597 (7th Cir.2000); *United States v. Sandles*, 23 F.3d 1121 (7th Cir. 1994); *United States v. Moya–Gomez*, 860 F.2d 706 (7th Cir.1988). The Federal Judicial Center's *Benchbook for U.S. District Court Judges* § 1.02 (4th ed.1996, with 2000 revisions) propounds 15 questions. This litany is a means of discouraging self-representation, which courts find inimical to well-functioning trials as well as hazard-

ous to defendants' chances of success. But we doubt that any list can be mandated. *Faretta* adopted the waiver standard of *Johnson v. Zerbst*, which noted that the determination "whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." 304 U.S. at 464, 58 S.Ct. 1019. That standard can be met without a demonstration that the accused has a deep understanding of how counsel could assist him. After all, *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), holds that any person competent to stand trial is able to waive counsel, and the competence standard is met by persons who are barely able to understand the proceedings, let alone recognize how lawyers navigate the legal shoals.

Let us inquire, then, whether James knew "what he [was] doing and [made] his choice ... with eyes open." On October 20, 1997, the district court appointed John Meyer to represent James. Fifteen months later, at a status conference devoted to selection of a trial date, James first expressed dissatisfaction:

James: May I say something?

Court: Yes.

James: I don't want him [Meyer] working on my case.

Court: Well—

James: I want him off my case. I don't want him working on my case. Court: I do not—what is the reason for that?

James: I don't trust him.

Court: I am here to set the case for trial. You have been in custody.

James: We don't agree—

Court: What?

James: We don't agree on certain things. That's all.

Court: Is this—

Mr. Meyer: Judge, this is the first I have heard of it. I tried to visit Mr. James last week and he refused a visit. But I have not had a chance to discuss this matter with him. But if he wants new counsel, of course, I have no objection.

Court: Well, I am not going to willynilly grant a request that is presented for the first time. I mean, if-what I will let you do is this: I would like you to discuss it with Mr. Meyer.

James: There is nothing to discuss with him.

After pending motions had been discussed, the parties took up the setting of a trial date, and the conference continued:

Court: I am going to set the case for March 15th. I think that is both workable and sufficiently out there for you all to be ready. And anything anyone wants to bring to my attention by way of counsel, I will ask you to do that in writing and file it with the Court.

Mr. Meyer: Judge, in that regard, I will visit with Mr. James in the Marshal's lockup after our court appearance and if he directs me to do so, I will file a motion to withdraw then.

James: You can do that now. I'm not talking to you about nothin'.

Court: Talk to Mr. Meyer. There is no reason for you to mistrust him because I have known him for a long time and he is a very honorable lawyer. In fact, I used to work with him in another lifetime.... And I will tell you this, Mr. James: He is a very effective defense lawyer. I mean, he fights very hard for his clients. So, for you to come up with—you know, there naturally may be differences between a client and a lawyer on how to proceed; but, the idea that he would somehow not be faithful to your case

is absolutely ridiculous, from what I know of Mr. Meyer. He is a very, very honorable and able defense lawyer, but that is my opinion. Okay. March 15th it is.

On January 22, 1999, three days after the status conference, Meyer filed a motion to withdraw as counsel, stating that he had conferred with James, who "reiterated that he did not trust counsel and further stated that he would refuse to cooperate with counsel in the defense of this case." On February 2 the court postponed the trial for two weeks, until March 29. On February 17 the district court held a status conference to take up once again James's objections to his lawyer. The court addressed a letter it had received from James. Although the letter has not been made a part of the record, it is apparent that it concerned James's renewed request for a different lawyer:

> Court: Mr. James, I have looked at your request for new counsel and considered it and I have also looked at some legal authorities and considered the whole state of the case; and, I guess my first question to you is: In what way are you claiming that Mr. Meyer has not done right by you in his representation of you, since you first mentioned that to me, I think, perhaps less than a month ago and it was Mr. Meyer—I recall Mr. Meyer saying this was the first time he had ever heard of any dissatisfaction expressed? So, my question to you is: What is your complaint about Mr. Meyer?

> James: Well, in the letter it says what my complaint is. That's why. He talked about me coming to see you—

> Court: About pleading guilty, you mean?

> James: Pleading guilty and talking about Mr. Hill. He don't talk about nothing about my defense.

* * *

> Court: And you do not want to follow that course?

> James: Right, I don't.

> Court: Well, he did not say you had to follow that course.

> James: That is true, but I don't want to hear that.

Judge Kocoras informed James that it is appropriate for a defense lawyer to discuss a plea with a client as a potential option and that James should not assume that a lawyer who raises the possibility of a guilty plea is a poor advocate. James was unmoved:

> James: But I don't want him on my case.

> Court: You don't want him on your case?

> James: No.

> Court: Well, this case has been a long time in the pipeline. He has been representing you for a long time. He is a very able lawyer.

> James: He hasn't been coming to see me.

> Court: Pardon me?

> James: I don't know what is going on.

> Court: What do you mean you do not know what is going on?

> James: He hasn't been coming to see me for—I can count on my fingers how many times he came over to the [prison] to see me.

> Court: Well, I think at some point you said five times.

> James: He's got too many people he's helping out. So, I prefer he helped them out.

> Court: Well, he is appointed in this case. You do not have a right to have an attorney appointed that you want, rather than who is available to represent you. I know he—Mr. Meyer

himself—was rather surprised that you had taken the position, and even he requested that—

James: That is the decision I choose.

Court: Pardon me?

James: That is the decision I choose.

Court: That is the decision you choose and here is the decision I choose: I do not think you have made out any basis for me to appoint a different lawyer. This case has been pending a long time. You have been in custody a long time. The other two defendants have been in custody a long time. We have continued the trial date regularly for everybody to get ready for trial. And I do not think it is in the interests of justice to continue it any more. And I do not think, quite frankly, there is a basis to believe that Mr. Meyer cannot adequately represent you. And, so, I am going to decline your request to have a different lawyer appointed to represent you.

James: I'll represent myself, then.

Court: Well, that is your choice. I think that is quite foolish, if I may say so.

James: That is what I'll do.

Court: I think Mr. Meyer would ably represent you. But we are too long in the game to get a new lawyer to review all of this material. We have had—there is, I think, material from two different trials—is that not right—for discovery purposes.

Government: Yes, Judge.

Court: And to put in a new lawyer now is to delay this case for probably, who knows. Six to nine months to a year.

Following that statement, Judge Kocoras asked James whether he understood the ramifications of his decision. The judge stated, among other things, that:

- James's decision to represent himself was his right,
- James's decision was "foolish,"
- the "stakes are very high,"
- the court "discouraged that choice,"
- "there are disadvantages in a person who is not a lawyer in representing himself,"
- it "is not a wise decision to represent yourself,"
- James "would be better served to have Mr. Meyer represent [him],"
- "just because you are representing yourself, we are not going to change [the] rules of evidence or any trial rules just because you are not skilled or learned in the law;" and
- "the admissibility or inadmissibility of evidence does not change just because you are representing yourself."

The prosecutor chimed in with some additional advice, which the district judge seconded:

- "that choice does not give him any particular rights or privileges at the [prison where he was incarcerated]",
- "he will be faced with numerous burdens and roadblocks to defending himself,"
- "he will still be bound by the rules of evidence and procedure and that there will be no leeway just because he is representing himself."

When James would not budge from his position, the judge relieved Meyer but appointed him as standby counsel to allow James "to avail himself of Mr. Meyer's professional abilities and skills." Meyer was present and available at trial to assist James and, in fact, assisted him. James could have asked Meyer to take over at any time, but through the end of the trial James stuck to his decision and served as his own lawyer. Only now does he insist that the district judge did not do enough to enlighten him about the risks he was assuming.

James behaved in a pig-headed fashion. It is hard to imagine that by quoting from § 1.02 of the *Benchbook* or expatiating about the drawbacks of self-representation ("a fool for a client ...") the district judge could have talked him out of his decision. The *Benchbook* includes questions such as: "Do you understand that the U.S. Sentencing Commission has issued sentencing guidelines that will affect your sentence if you are found guilty?" and "Do you understand that the Federal Rules of Evidence govern what evidence may or may not be introduced at trial and that, in representing yourself, you must abide by those rules?" "Yes" answers to these questions do not evince *understanding* of the complexities that lie ahead. Lists do not convey knowledge or change minds. It is hard to imagine any defendant with even modest resolve responding: "Oh, now that I know that something called the 'Sentencing Guidelines' exists, I see the foolishness of representing myself." No one supposes that the judge must explain how the Guidelines *work*, for the validity of a waiver does not depend on possession of a legal education. As *Johnson, Adams*, and *Faretta* show, the question is not whether the district judge used a checkoff list but whether the defendant understood his options. All a judge can do as a practical matter—all a judge need do as a legal matter—is ensure that the defendant knows his rights and avoids hasty decisions. Often asking the *Benchbook* questions may ensure that the defendant has his eyes open, but we do not read any of this court's decisions to hold that the litany is prescribed in every case or that advice about any particular disadvantage of self-representation is essential; such a reading would put us at odds with the Supreme Court.

In or out of the criminal justice system, people freely assume risks that they do not fully understand. Anyone who chooses a profession or a spouse, or decides to have children, takes chances subject to more variables than the mind can juggle. Yet we do not call these decisions unintelligent; venturing into the unknown with a sketchy idea of what lies ahead may be the wisest choice even when the odds are beyond calculation. Spelunkers, base jumpers, and investors likewise brave exposure to unexpected and unforeseeable events. James was in the same position—and he knew it, having had some experience with the legal process while racking up prior convictions. After being told that he must comply with all rules of evidence and procedure, James was asked whether he understood and answered: "A little bit." That shows a sound appreciation of his position (James did not pretend that he had a legal education) rather than lack of intelligent choice. If James was about to face hazards he could not fully understand, his election was nonetheless valid because he *knew* that he was in uncharted waters. James could and did make a knowing and intelligent waiver. "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." *Moran*, 509 U.S. at 399, 113 S.Ct. 2680 (emphasis in original, footnote omitted).

Even with the aid of counsel on appeal, and the benefit of hindsight (having labored through the trial), James does not contend that there was any missing bit of knowledge that, if conveyed, would have led him to change his mind in February 1999. He really wants another crack at acquittal, not a more informed initial decision. Cf. *United States v. Frazier–El*, 204 F.3d 553, 559 (4th Cir.2000). Section 1654 and *Faretta* require courts to respect a litigant's demand for self-determination at the most critical moment in the criminal process. That right is not honored if judges must depict self-representation in such unremittingly scary terms that any

reasonable person would refuse. (If a reasonable person would welcome counsel, then does insisting on self-representation demonstrate incompetence to make the decision? To say this, however, would be to abolish the right of self-representation.) James knew and stood on his rights and, having received his due, cannot complain. A defendant bullied or frightened into acquiescing in a lawyer that he would rather do without would be in a much better position to say that the choice was not made knowingly or intelligently.

4. Defendants present a number of other arguments. All have been considered, but none requires discussion.

AFFIRMED.