ATTORNEYS FOR APPELLANT
Eric Koselke
Brent Westerfeld
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

In the
### Indiana Supreme Court

No. 71S00-0507-DP-333

WAYNE KUBSCH,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the St. Joseph Superior Court, No. 71D02-9812-CF-592
The Honorable William Albright, Judge

**May 22, 2007**

**Shepard, Chief Justice.**

Appellant Wayne Kubsch has been tried twice for triple murder. Two juries found him guilty and both juries recommended the death penalty. This appeal arises from his second trial. Among other claims, he contends that the trial court erred in failing to appoint a special prosecutor to the case because St. Joseph County Prosecutor Michael Dvorak had a previous professional relationship with a witness who testified against Kubsch. We conclude that a special prosecutor was not necessary because no actual conflict existed between Dvorak and his duties to his former client, to Kubsch, or to the citizens of St. Joseph County.

## Facts and Procedural History

On September 18, 1998, twelve-year-old Anthony Earley found the bodies of his step-brother Aaron Milewski and Aaron's father Rick Milewski in the basement of his Mishawaka home. Anthony lived in the home with his mother Beth Kubsch, who was Aaron's mother and Rick's ex-wife, and Wayne Kubsch, Beth's husband at the time. Anthony looked more closely at the bodies, and then fled to a neighbor's house, from which the police were eventually summoned.

The Mishawaka Police Department arrived on the scene about 5:45 p.m. When Wayne Kubsch arrived at the house, he had to be restrained from entering. Kubsch then accompanied police officers to the South Bend Police Department for questioning by detectives of the special crimes unit.

Around 9 p.m., after Kubsch left the police station, crime scene investigators informed the detectives that they had also found Beth Kubsch's body in the basement, inside a "fort" Anthony had constructed underneath the stairs using old blankets. Beth had been "hog-tied" with duct tape and her head covered in tape. Like Aaron and Rick, she had been stabbed repeatedly.[1]

Upon learning about the discovery of Beth's body, detectives instructed a junior police officer to locate Kubsch and bring him back to the station. The officer complied, and returned with Kubsch. The detectives requested that Kubsch allow a search of his vehicle, which he did, signing a consent form. The police then impounded the vehicle and searched it.[2]

---

[1] All three victims sustained severe stab wounds. Subsequent autopsies revealed that Aaron and Rick were also shot at close range.

[2] The search of Kubsch's vehicle and the manner in which he was questioned on the night of the murders were subjects of contention in his first appeal. Kubsch v. State, 784 N.E.2d 905, 916-18 (Ind. 2003). We held that both the search and questioning, as well as any evidence obtained, were valid. Id. at 918. Despite the rather delicate manner in which the matter was handled by the State, Kubsch objected to the introduction of that evidence again at his second trial. (Trial Tr. at 1481.) Kubsch raises the issue again on this appeal. (Appellant's Br. at 35-47.)

He notes in his brief, however, that he raises this issue "to preserve Kubsch['s] rights to present them in subsequent federal court review." (Id. at 35.) This time around, the claim does not rest on any new evidence at trial or citation to any new authority regarding the validity of the search. In his second trial, Kubsch relied on the record

In late December 1998, the State charged Kubsch with murdering Beth, Aaron, and Rick. In April 1999, the State filed notice of intent to seek the death penalty. A trial ensued in June 2000, and Kubsch was found guilty of the murders. The jury recommended the death penalty, and the trial judge entered an order imposing death. Kubsch appealed, claiming the order was defective. We agreed and remanded to the trial court to enter a new order. The trial court did so, and Kubsch appealed again. We reversed on the basis of a Doyle violation and ordered a new trial. Kubsch v. State, 784 N.E.2d 905, 910 (Ind. 2003).[3]

During the second trial, in March 2005, the prosecution presented essentially the same case as it had at the first, arguing that Kubsch killed Beth in order to collect on her life insurance policy. Kubsch owed some $430,000 in mortgage debt on various rental properties, and another $23,000 in unsecured credit card debt. The State showed that, less than two months before the murders, Kubsch and Beth increased Beth's term life coverage to $575,000.

Cell phone records revealed that Kubsch made calls from the area near the house where the killings occurred at a time when he initially claimed to be traveling to Michigan. Testimony by Brad Hardy indicated that he and Kubsch had gone to Kubsch's home during Wayne's lunch hour, and that he had seen Beth in the house. Hardy also testified that the day after the murders, Kubsch asked him to lie to the police about their activities the day before.

The prosecution introduced some physical evidence linking Kubsch to the crime. It managed to link a fiber found in the duct tape used to bind Beth to a fiber taken from Kubsch's Geo Tracker. A duct tape wrapper in the Tracker matched the brand of duct tape used to bind Beth. A bank receipt, also found in the Tracker, showed a transaction made by Beth the morning of her murder.

---

of his first trial to establish the facts surrounding this claim. For this reason, and because Kubsch voluntarily foregoes our review, we do not address this claim.

[3] The State used videotapes at trial that were taken during Kubsch's interviews with the police on the night of September 18, 1998. Those videotapes showed Kubsch invoking his Fifth Amendment right to silence, and the State used Kubsch's silence as "affirmative proof of its case in chief" in clear violation of Doyle v. Ohio, 426 U.S. 610 (1976). Kubsch, 784 N.E.2d at 914. We concluded that the State had "not carried its burden in demonstrating that references to Kubsch repeatedly invoking his right to silence [was] harmless beyond a reasonable doubt." Id. at 916.

Kubsch testified at trial, giving an account different from the one he had given to the police during his initial interviews. Kubsch admitted that he had gone home during his lunch hour, but said he went alone and smoked part of a marijuana cigarette before returning to work. Kubsch opined that it was likely during the stop at home that he collected the bank receipt and took it with him. He also admitted that he had not gone immediately to Michigan as he previously told police. Rather, he testified he had first stayed in his workplace parking lot hoping to buy marijuana from a co-worker, returned home and retrieved the remainder of the marijuana cigarette he smoked earlier that day, and then left for Michigan to pick up his son. Kubsch said no one was home when he arrived at the residence after work.

Kubsch sought to exclude the evidence collected from his vehicle, claiming the search was illegal, and asked to introduce the previous testimony of Amanda Buck, who, according to the defense, would have testified that she saw Aaron after 3:30 p.m. on the day of the murders. The trial court denied Kubsch's motion to exclude, and barred the defense from showing a videotape or reading transcripts of Buck's previous testimony.

Following the presentation of the evidence, the jury found Kubsch guilty of three counts of murder. After the sentencing hearing, where Kubsch appeared *pro se*, the jury recommended death. On April 18, 2005, the judge imposed a death sentence.

Kubsch challenges both his conviction and sentence in this appeal. As to guilt, Kubsch claims the court violated his right to present a defense by refusing to admit Buck's previous testimony. Second, and more significantly, Kubsch argues that the trial court should have appointed a special prosecutor to avoid a conflict of interest arising from St. Joseph County Prosecutor Michael Dvorak, who previously represented Brad Hardy in a related criminal matter.

As for the sentence, Kubsch argues that his waiver of counsel at the sentencing phase was not knowing, intelligent, or voluntary, that the court should have instructed the jury that it must find the aggravating circumstances outweigh the mitigators beyond a reasonable doubt, that no individualized sentencing occurred, and that the trial judge failed to independently consider whether he was bound to follow the jury's recommendation.

## I. Special Prosecutor Properly Denied

Kubsch pointed to Michael Dvorak's earlier representation of Brad Hardy, one of the witnesses against Kubsch. The State once charged Hardy with conspiring with Kubsch to commit the murders and with assisting a criminal. These charges were filed against Hardy in May 2000, several months after Kubsch was charged. Hardy retained Dvorak, who was in private practice at the time. Dvorak represented Hardy at a deposition conducted by Kubsch's attorneys and during Hardy's testimony at the first murder trial in the summer of 2000. During the representation, Hardy received use immunity for his testimony in the first trial.

Kubsch was initially convicted on August 28, 2000. The charges against Hardy pended, with Dvorak still representing him, until May 6, 2002 when the State moved to dismiss, and the court did so. In November 2002, Dvorak was elected St. Joseph County Prosecutor. He took office in January 2003, two months before we reversed Kubsch's first conviction. Following a pre-trial hearing on October 31, 2003, Judge Frese ruled there was no actual conflict of interest arising from this scenario and denied the request for a special prosecutor.[4] Kubsch now claims that this ruling was incorrect and argues that it tainted the second trial sufficiently to warrant a third.

At the time of Kubsch's trial, our statutes afforded criminal defendants a vehicle for asking the trial court to appoint a special prosecutor when it is evident "by clear and convincing evidence that the appointment is necessary to avoid an actual conflict of interest . . . ." Ind. Code Ann. § 33-39-1-6(b)(2) (West 2004). A judge called upon to decide whether the prosecutor should be disqualified must determine whether "the controversy involved in the pending case is substantially related to a matter in which the lawyer previously represented another client." State ex rel. Meyers v. Tippecanoe County Court, 432 N.E.2d 1377, 1378 (Ind. 1982). He must also examine "whether the prosecutor has received confidential information in the prior representation, and, more importantly, whether the information may have subsequently assisted the prosecution." Johnson v. State, 675 N.E.2d 678, 682 (Ind. 1996).

---

[4] This hearing and ruling occurred before Judge Frese, who presided at the first trial and recused himself from the second trial. It was after that recusal that Judge Albright took the case.

Perhaps recognizing that any argument about client confidences relates solely to Hardy and not to him, Kubsch argues that actual conflicts of interest arise not simply from the acquisition and use of client confidences by prosecutors, but any time circumstances exist "'in which [the prosecutor] cannot exercise his or her independent [] judgment free of compromising interests [or] loyalties.'" (Appellant's Reply Br. at 1 (quoting State v. Culbreath, 30 S.W.3d 309, 312 (Tenn. 2000)).) Kubsch cites authority declaring that the unfair use of client confidences gained through the prior representation of a defendant or co-defendant is not generally recognized as the "only benchmark for determining whether there is an actual conflict of interest." (Id.); see also 63C Am. Jur. 2d Prosecuting Attorneys § 27 (1997).

The language of Ind. Code § 33-39-1-6(b)(2) and our own case law indicate that the question of prosecutorial disqualification is not to be treated in the same manner in which attorney disqualification is determined in the civil context. Johnson, 675 N.E.2d at 682. Rather than limiting ourselves with "material adversity," as we would in the civil context, we must determine whether the relationship between Hardy and Dvorak gave rise to an actual conflict that resulted in prejudice to Kubsch. Id.

The substance of Kubsch's claim is that during the second trial, Dvorak's professional duties and obligations to Hardy as a former client rendered him unable to treat Kubsch fairly and impartially, or to represent the interests of the State without conflict. (Appellant's Br. at 20.) As evidence of this disability, Kubsch points out that Dvorak was unable to testify fully at the pre-trial hearing on whether a special prosecutor should be appointed. Kubsch says such testimony would have theoretically assisted both the defense and the prosecution. (Id. at 21.) Kubsch also claims that the prior representation prevented Dvorak from seeking a plea bargain with Kubsch since doing so would have put his former client at risk of future prosecution. (Id. at 21-22.)

We think the trial judge got it right here. While the relationships among the parties created the potential for a conflict, the subsequent actions of those involved demonstrate that no actual conflict arose.

This is certainly true of Kubsch's claim regarding Dvorak's testimony at the pre-trial hearing. Kubsch contends that Dvorak's ethical obligations to Hardy prevented him from answering questions about the representation that might have revealed whether Dvorak possessed disqualifying confidential information about Kubsch and the murders. Kubsch contends that his inability to question Dvorak ultimately prejudiced him by preventing him from subjecting Dvorak to a meaningful examination about the extent of his knowledge of the case that might have revealed disqualifying facts. (Id. at 26-27.)

It is clear enough from the record that Dvorak did not possess such information. The State presented to the trial court all the statements, depositions, and testimony of Hardy that were a matter of record. (Hr'g Tr. at 4-7.) When asked if "you possess any other information about this case, about the murders . . . than what is contained in the exhibits that [the State] admitted into court today?" Dvorak responded, "I don't believe so." (Id. at 14.) Importantly, at the hearing, Hardy specifically relinquished his privilege and allowed Dvorak to answer one question relating to the representation: "Did I tell him anything different than what's on them transcripts." (Id. at 47.) The prosecution subsequently asked Dvorak whether "there [is] any information that you possess from your conversations with Mr. Hardy that is different or omitted from any testimony and information he gave in depositions, testimony, or statements to Special Crimes?" (Id. at 48.) Dvorak answered no. (Id.)

Kubsch seeks to minimize the import of this disclosure by suggesting that it was insufficient to probe Dvorak's knowledge of the defense. The release of the privilege, however, provided an answer to the crucial question: Did Dvorak possess information about the crime not otherwise available to another prosecutor? Through the release of the privilege, Dvorak was able to show he had no more information that could have been used against Kubsch than any other prosecutor. In the absence of such information, no actual conflict arose.

Specifically, there is no indication Dvorak either gained any privileged or otherwise non-public information from Hardy or subsequently used such information at the second trial. And, inasmuch as Kubsch and Hardy had never engaged in a joint defense, Dvorak would not have learned anything from Kubsch for subsequent deployment, either. Compare Banton v. State, 475

7

N.E.2d 1160, 1164 (Ind. Ct. App. 1985) (prosecutor disqualified where "via a previous relationship with the same case, [prosecutor learned] the details of [defendant's] case")[5] with Garren v. State, 470 N.E.2d 719, 723 (Ind. 1984) (prosecutor not disqualified where "[d]efendant has failed to show that the [p]rosecutor obtained information from him in confidence which was relevant to the facts of the [case at bar]"), and Williams v. State, 631 N.E.2d 485, 488 (Ind. 1994) (prosecutor not disqualified where deputy prosecutor did not provide any "information or assistance to the prosecutor" or participate at defendant's trial). In Williams, we held it was appellant's burden to show both that "deputy prosecutor received confidential information" and that "prejudice actually [] resulted" from the use of confidential information. 631 N.E.2d at 487. In this case, there was no evidence that confidential information was received or used. Thus, there was no need to disqualify Dvorak.

It is also apparent that no actual conflict arose as affected the possibility of a plea bargain. As Judge Frese astutely noted, an actual conflict would have arisen had the parties entered into a plea bargaining process because doing so would have put Dvorak into a position where his own duty to Hardy would have conflicted with his duty of impartiality to Kubsch. (Hr'g Tr. at 60-61.) Kubsch contends that Dvorak alone was unwilling to enter a plea agreement. (Appellant's Br. at 21.) The record does not support this contention. At the pre-trial hearing, Judge Frese conducted a private conference with Kubsch and the defense counsel. (Hr'g Tr. at 50-58.) Judge Frese specifically asked Kubsch if he were willing to "discuss a plea agreement where the death penalty comes off the table." (Id. at 57.) Kubsch responded that he had no interest in entering into plea discussions. (Id. at 58.) During the subsequent description of the substance of the conference in open court, Judge Frese indicated his perception that Kubsch was unwilling to enter into any plea bargaining process. (Id. at 82-84.) Kubsch's attorneys made no attempt to object to these statements, suggesting it accurately reflected Kubsch's position. As Kubsch now seems to be contending that Dvorak's prior representation made a plea bargain unattainable, we observe that one cannot be unfairly denied something that he did not want. We see no actual conflict of interest along these lines.

---

[5] Defendant who prosecutor formally represented "testified he told [prosecutor] everything concerning the crimes alleged, including material he would not reveal to the prosecutor." Banton, 475 N.E.2d at 1164.

Kubsch does make one other point worthy of mention here. He contends that Dvorak unfairly and prejudicially failed to investigate Hardy's alleged role in the murders since doing so would have placed his former client at risk. (Appellant's Br. at 28.) In doing so, Kubsch contends Dvorak ignored potentially exculpatory evidence because of his interest in protecting his own former client. This argument might have more punch had not Dvorak's predecessor as St. Joseph County Prosecutor, Christopher Toth, whom Dvorak defeated in a dramatic electoral contest, treated Hardy in exactly the same way as Dvorak. Prosecutor Toth granted Hardy use immunity for his testimony during the first trial and ultimately dismissed the charges against him. (Appellant's App. at 235, 237-38.) For all that appears, Toth simply concluded that Hardy was not culpable. There is no evidence otherwise.[6]

Ultimately, it is the defendant's burden to produce evidence of an actual conflict, and in this case he has not. He has also failed to make convincing arguments regarding his due process claims. We conclude the trial court rightly denied the motion for appointment of a special prosecutor.

## II.     Amanda Buck's Videotaped Statement

Amanda Buck was nine years old at the time of the murders and lived across the street from Aaron Milewski. She gave a videotaped statement to Police Officer Riehl on September 22, 1998, four days after the murders; in the videotape, she said she saw Aaron at his house after 3:30 p.m. on the day of the murders. At trial, however, Buck testified that she had no memory of the police interview and that she did not see Aaron on the day in question. Kubsch attempted to read a transcript of the videotape into evidence as a recorded recollection exception to hearsay, or alternatively to impeach Buck with the prior inconsistent statement. The trial court denied admission of the videotape and any impeachment.

---

[6] We note briefly that Kubsch also raises claims that his due process rights under the Federal and Indiana Constitutions were violated, because he was denied trial at the hands of a disinterested prosecutor. (Appellant's Br. at 27-29.) On these points Kubsch makes no citation to authority in support of his position.

Kubsch argues on appeal that the recorded recollection exception applied, that he should have been able to impeach Buck, and that the trial court violated his right to present a defense when it refused to admit the videotape.

A.  Recorded Recollection.

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly . . . .

Ind. Evidence Rule 803(5).

The final element – the recording reflects the witness's knowledge correctly – is the one at issue.  The recorded recollection exception applies when a witness has insufficient memory of the event recorded, but the witness must be able to "vouch for the accuracy of the prior [statement]."  Gee v. State, 271 Ind. 28, 36, 389 N.E.2d 303, 309 (1979); see also Williams v. State, 698 N.E.2d 848, 851 n. 4 (Ind. Ct. App. 1998) (requiring "some acknowledgement that the statement was accurate when it was made").  Buck testified twice that she had no memory of being interviewed by the police in 1998.  (Trial Tr. at 2985.)  As a result, the trial court correctly denied Kubsch the opportunity to read Buck's statement into evidence, because Buck could not vouch for the accuracy of a recording that she could not even remember making.

B.  Prior Inconsistent Statement.  The trial court ruled that Kubsch could not impeach Buck with her statements in the videotape because Buck gave no substantive evidence in her trial testimony.  (Id. at 3031-32, 3120.)  The court observed that Buck simply stated that she could not remember being interviewed by the police four days after the murder, and therefore, there was "no positive fact . . . subject to impeachment."  (Id. at 3120.)

It was within the trial court's discretion to rule that Buck's testimony that she could not remember the police interview was not inconsistent with her statements to the police that she saw Aaron around 3:30 in the afternoon.  See Dunlap v. State, 761 N.E.2d 837, 845 (Ind. 2002)

10

("statement at trial of 'I am not sure' or 'I don't remember' is not necessarily inconsistent with an earlier statement that provides the answer to the question being asked").

Buck's claim of lack of memory, however, was not her only testimony. In response to defense counsel's attempt to establish Buck did not remember her statements to the police, Buck offered, "I probably didn't see [Aaron], because I go straight [from] home to the day care, and then I would go home afterwards." (Trial Tr. at 2985.) This testimony directly contradicts her statement to the police that she saw Aaron that afternoon, and Kubsch should have been allowed to impeach her on this matter.

We hold this error harmless, nonetheless. Monica Buck, Amanda's mother, was present with Amanda during the videotaped interview on September 22, 1998. (Id. at 3025.) Three days after the interview, Monica's husband Lonnie called Officer Riehl to tell Riehl that Amanda was mistaken and instead saw Aaron the afternoon before the murders. (Id. at 3012-14.) Monica followed up with a subsequent statement indicating that it was not Friday that she and Amanda saw Aaron. (Id. at 3013.) The prosecution was prepared to put both Officer Riehl and Monica on the stand to testify to this effect.[7] (Id. at 3014-15.) Amanda's testimony should have been impeached, but other testimony would have supported hers had she been impeached, and therefore, her testimony likely did not contribute to the conviction. See Pavey v. State, 764 N.E.2d 692, 703 (Ind. Ct. App. 2002) ("An error in the admission of evidence is not prejudicial if the evidence is merely cumulative of other evidence in the record.").

### III. Kubsch's Waiver of Counsel Was Knowing and Intelligent

Kubsch asked to represent himself during the penalty phase, and the court permitted it. He now contends Judge Albright failed to adequately warn him of the dangers and difficulties of self-representation, and thus his decision to represent himself was not knowing and intelligent.

---

[7] The availability of this testimony is also the reason why Kubsch's claim that he was denied his federal constitutional right to present a defense fails. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (protecting defendant's due process right by recognizing an exception to application of evidence rules where evidence found to be trustworthy).

In particular, Kubsch argues that the judge minimized the difficulty of self-representation and led him sufficiently astray to invalidate the waiver of his right to counsel.

The Sixth Amendment does not "force a lawyer upon [a criminal defendant] . . . when he insists that he wants to conduct his own defense." Faretta v. California, 422 U.S. 806, 807 (1975). Nevertheless, in order to waive the constitutionally protected right to counsel, a defendant "must 'knowingly and intelligently' forgo those relinquished benefits" provided by counsel, and be advised of the potential pitfalls surrounding self-representation so that it is clear that "'he knows what he is doing and [that] his choice is made with eyes open.'" Id. at 835 (citations omitted). There are no magic words a judge must utter to ensure a defendant adequately appreciates the nature of the situation. Rather, determining if a defendant's waiver was "knowing and intelligent" depends on the "particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." Johnson v. Zerbst, 304 U.S. 458, 464 (1938).

We have elected to follow the lead of the Seventh Circuit in adopting a means for an appellate court to review the adequacy of a waiver. We consider four factors: "'(1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed *pro se*.'" Poynter v. State, 749 N.E.2d 1122, 1127-28 (Ind. 2001) (quoting United States v. Hoskins, 243 F.3d 407, 410 (7th Cir. 2001)). Considering these factors as they relate to the facts and circumstances of this case, we conclude Kubsch's waiver was knowing and intelligent.

First, we examine whether the court held any formal inquiry into Kubsch's decision to proceed *pro se*. A court need not provide an exhaustive list of the dangers of *pro se* representation, but must "impress upon the defendant the disadvantages of self-representation." United States v. Todd, 424 F.3d 525, 531 (7th Cir. 2005) (citing United States v. Moya-Gomez, 860 F.2d 706, 732, 734 (7th Cir. 1988)). Indeed, it has been noted that the production of an exhaustive list would not necessarily ensure the knowingness and intelligence of waiver since even affirmative answers to pro forma "questions do not evidence *understanding* of the

12

complexities that lie ahead." <u>United States v. Hill</u>, 252 F.3d 919, 928 (7th Cir. 2001). Rather, we look to whether the warnings issued were sufficient to apprise the defendant of the dangers he is facing in the particular matter at hand. <u>Id.</u>

Kubsch presents a list of what he calls critical omissions: not told his failure to object to perceived legal error would waive issues for appeal; not told he would need to submit his own jury instructions if he objected to those of the State; not told the precise nature and procedure to be followed during the penalty phase; and judge minimized the dangers and difficulty of self-representation by telling Kubsch that "your representation would not be as complicated . . . if you were handling the whole trial." (Appellant's Br. at 48-52; Trial Tr. at 3342.)

Kubsch himself eliminated the need for many of these warnings. Kubsch was certainly made aware that at the penalty phase he could produce witnesses and other evidence in mitigation. He was notified what evidence his attorneys planned to present and declined to present that information himself. (Trial Tr. at 3337-38.) In doing so, Kubsch rendered the penalty phase significantly less procedurally complicated than it could have been. He also made any court warnings about the potential difficulties in offering evidence for admission, or about making timely objections to the evidence submitted by the prosecution much less useful than they might customarily be. Indeed, as the trial judge pointed out (before the statement Kubsch claims impermissibly minimized the danger of self-representation) in the absence of mitigating or aggravating evidence, there was little more to the process than allowing both sides to address the jury. (<u>Id.</u> at 3338, 3341-42.) The judge repeatedly made it clear that Kubsch would have this right, as well as the right to present evidence if he chose to do so.

The court also warned Kubsch that were he to proceed *pro se*, his trial counsel could not speak for him during the penalty phase, and Kubsch responded that he understood this warning. (<u>Id.</u> at 3343.) At the same time, the court informed Kubsch that his trial counsel would be available, and that he could seek their advice if he desired. (<u>Id.</u>) Moreover, the court warned Kubsch that by proceeding *pro se*, he waived any claim on appeal of ineffective assistance of counsel, and Kubsch indicated that he understood this as well. (<u>Id.</u> at 3349-50.) The judge informed Kubsch of the gravity of the proceedings and the nature of the potential punishments,

13

and Kubsch indicated he understood. (Id. at 3350-51.) Taken together, these warnings were adequate to warn Kubsch of the relevant dangers related to self-representation during the penalty phase, and Kubsch's responses demonstrate a knowing and intelligent decision to forgo the benefits of counsel. Although they represent a basic set of warnings, their brevity alone is not dispositive of whether Kubsch's waiver was knowing and intelligent. The waiver must be viewed in light of all facts and circumstances.

Second, we examine whether there is other evidence to suggest Kubsch understood the dangers of self-representation, and there is. For example, the trial judge wanted it noted for the record:

> [T]hat the Court observed Mr. Kubsch throughout trial, that during trial he pretty much constantly was able to confer with his attorneys, was able to confer with his factual investigator that interviewed witnesses in this case, that he testified in this case, that the Court found his testimony to be coherent and relevant to the facts of this case, and that the Court has no reason to doubt Mr. Kubsch's competency to represent himself in this matter.

(Id. at 3340.)

Kubsch's competence was never an issue. As Judge Albright pointed out, throughout trial Kubsch was alert, engaged, coherent, and capable of understanding the proceedings and their import. There is no evidence to suggest that his abilities to comprehend complex matters diminished suddenly prior to his decision to proceed *pro se*. Consequently, given Kubsch's obvious intelligence and grasp of the issues surrounding his trial – as demonstrated during his testimony and his statement to the jury during the penalty phase – there is little reason to doubt that Kubsch's waiver was made by a person who grasped the difficulties and dangers of self-representation.

Third, we consider Kubsch's prior background and experience. We examine Kubsch's "educational achievements, prior experience with the legal system . . . and performance at trial in the case at bar." United States v. Sandles, 23 F.3d 1121, 1128 (7th Cir. 1994). We have already noted, as the trial judge did, that Kubsch's performance during his second trial demonstrates knowledge of criminal law and an understanding of the sentencing process. We cannot help but

14

note that at the time he chose to represent himself, Kubsch had already participated in two murder trials and one penalty phase. Although Kubsch did not know all of the rules and procedures, he certainly had experience with the penalty phase proceeding. In other words, he obviously knew from his own experience of his right to call witnesses, present other evidence, and propose mitigating factors.

Finally, we consider the context of Kubsch's decision. The Seventh Circuit has observed that "a defendant who waives his right to counsel for strategic reasons tends to do so knowingly." Todd, 424 F.3d at 533 (citing United States v. Bell, 901 F.2d 574, 579 (7th Cir. 2001)). Kubsch waived his right to counsel for a strategic reason: he did not want to present witnesses.

His lawyers stood ready to call ten witnesses with mitigating evidence to offer: several members of Kubsch's family, former employers, a correctional expert, and a Ph.D. social worker. Kubsch not only declined to call witnesses, but during his statement to the jury, Kubsch indicated that he had not called witnesses or presented any mitigating evidence because he did not "even dare try to insult [the jury's] intelligence" by suggesting the crimes he had been found guilty of did not deserve the death penalty. (Trial Tr. 3372-73.) Choosing to waive counsel because one does not agree with trial strategy is perhaps not the best choice, or even a good choice, but it can be a rational choice.

Kubsch's trial lawyers believed Kubsch received adequate advisements about the dangers of self-representation. (Id. at 3342-43.) They personally discussed these dangers with Kubsch. (Id. at 3336.) Looking at all the facts and circumstances, we conclude that the trial judge correctly determined Kubsch's waiver of counsel for the penalty phase was knowing and intelligent.

## IV. Weighing Aggravators and Mitigators

Kubsch argues that the trial court violated his due process and jury trial rights when it declined to instruct the jury that the jury had to find beyond a reasonable doubt that aggravating circumstances outweighed mitigating circumstances. (Appellant's Br. at 53-61.) First, contrary to Kubsch's position, the weighing of the aggravators and mitigators does not have to be proven beyond a reasonable doubt. Ritchie v. State, 809 N.E.2d 258 (Ind. 2004).[8]

Since we decided Ritchie, the U.S. Supreme Court rejected a challenge to the death penalty law of Kansas in which the prisoner made a similar argument about the standard of proof. Kansas v. Marsh, 126 S. Ct. 2516, 2524 (2006). The Kansas statute called for imposition of death in instances where the jury found that aggravators and mitigating circumstances had equal weight. The prisoner (and the dissenters) argued that the Constitution required that death only be ordered where the former outweighed the latter. Id. at 2541 (Souter, J., dissenting). The Court rejected this contention -- and a corollary claim that directing death when the circumstances are in equipoise prevented a jury from performing its proper functions. Id. at 2527.

The breadth of the recent opinion in Marsh, led by the very justices who have championed Blakely and Booker, makes it apparent that Kubsch's claim that the Constitution

---

[8] Ritchie analyzed Ind. Code § 35-50-2-9 in light of the U.S. Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466 (2000):

> [T]he Indiana Death Penalty Statute does not violate the Sixth Amendment as interpreted by Apprendi . . . . Once a statutory aggravator is found by a jury beyond a reasonable doubt, the Sixth Amendment . . . is satisfied. Indiana now places the weighing process in the hands of the jury, but this does not convert the weighing process into an eligibility factor. The outcome of weighing does not increase eligibility. Rather, it fixes the punishment within the eligible range. It is therefore not required to be found by a jury under a reasonable doubt standard.

Ritchie, 809 N.E.2d at 268.

Blakely v. Washington, 542 U.S. 296 (2004), was handed down after Ritchie, but its holding does not affect our decision in Ritchie. Blakely defined statutory maximum as the maximum sentence a judge may impose based on the jury verdict or a defendant's admissions without finding additional facts. Blakely, 542 U.S. at 303. Indiana's death penalty statute, however, does not allow for judicial fact finding when the sentencing hearing is by jury. See Ind. Code Ann. § 35-50-2-9(e), (l).

requires that aggravating circumstances outweigh mitigators beyond a reasonable doubt is untenable.


## V. Was There Individualized Sentencing?


Kubsch cites the Court's declaration that an individualized decision is essential in capital cases. Woodson v. North Carolina, 428 U.S. 280, 304 (1976). He contends that the absence of mitigating evidence before the jury in his case meant that there was no such individualized sentence. This state of the evidence, of course, is the direct result of the strategy Wayne Kubsch insisted on following – a strategy he discussed with his lawyers, articulated in open court, and discussed directly with the jury.


Kubsch further contends that the trial judge erred by following the jury's recommendation, rather than ordering a new pre-sentence report and determining for himself, apart from the jury's recommendation, whether the evidence and the aggravators and mitigating factors warranted death or life without parole.


This Court's assessment of the role of jury and judge after the General Assembly's 2002 amendments to the statute on death and life without parole is a work in progress. Still, two principles have been articulated that seem adequate to address the present case. In one of several cases handed down together, we observed that "there is only one sentencing determination, which is made by the jury." Stroud v. State, 809 N.E.2d 274, 287 (Ind. 2004). In another case, Justice Boehm said that the amendments were not intended to "overturn traditional checks on jury error or jury discretion, or to eliminate the trial judge's function under Trial Rule 59." Helsley v. State, 809 N.E.2d 292, 306 (Ind. 2004) (Boehm, J., concurring).


Whatever else may be said about the sentencing process in this case, fashioned as it was by Kubsch himself (who declined the judge's invitation even to make a statement before the court pronounced sentence), what we do know about the aggravating circumstances and the mitigating circumstances that counsel would have attempted to prove had Kubsch not prevented

17

it presents no basis for setting aside the jury's recommendation and the trial court's sentence based upon it.

The aggravators were the fact of a triple murder and the fact that one of the victims was under the age of twelve. These are two rather substantial factors. The mitigating evidence Kubsch's lawyers would have tried to present was that Kubsch was usually a caring person, a good worker, someone who would live an orderly prison life, and that his triple killing was an aberration to his personality. (Appellant's App. at 348-53.) All in all, even had this evidence been placed before the trial judge, it does not appear to rise to the level necessary under, say, Trial Rule 59 for setting aside a jury verdict.

## Conclusion

We affirm the judgment of the trial court.

Dickson, Sullivan, Boehm, and Rucker, JJ., concur.