WOOD, Chief Judge,
dissenting.
My colleagues are prepared to send Wayne Kubsch to his death on the basis of a trial at which the jury never heard critical evidence that, if believed, would have shown that Kubsch was not the man responsible for the horrible murders of his wife Beth, her son, Aaron Milewski, and her ex-husband, Rick Milewski. I am not. They concede that the evidence against Kubsch was entirely circumstantial. While there is nothing wrong with circumstantial evidence, it is impossible to have any confidence in a verdict rendered by a jury that heard only part of the story. In my view, the state courts have reached a result that is inconsistent with, and an unreasonable application of, the United States Supreme Court’s decision in Chambers v. Mississippi 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Had the contested evidence been admitted under the Chambers exception to the normal rules of evidence, a properly instructed jury may have acquitted Kubsch. It also may have convicted him: I do not argue that the state courts wrongly viewed the evidence as sufficient for conviction. But that is not the question before us. The question is whether Kubsch was able to present his entire case and obtain a reliable jury verdict. Because I believe that he was deprived of this essential protection, I would grant the writ and give the State of Indiana a new opportunity to try him.
I
As required by the Antiterrorism and Effective Death Penalty Act, I rely on the facts used by the Supreme Court of Indiana after Kubsch’s second trial, conviction, and sentencing. See Kubsch v. State, 866 N.E.2d 726 (Ind.2007) (Kubsch II). That opinion summarized the facts that had been developed in earlier appeals. See Kubsch v. State, 784 N.E.2d 905 (Ind. 2003) (Kubsch I); see also Kubsch v. State, 934 N.E.2d 1138 (Ind.2010) (Kubsch III) (opinion at post-conviction stage).
Wayne and Beth Kubsch were married in November 1997. It was a second marriage for both: Beth had two sons, Aaron Milewski, from her previous marriage to Rick Milewski, and Anthony Earley; and Kubsch had a son, Jonathan, who lived with his mother, Tina Temple. Aaron lived with Rick in South Bend, Indiana, *817 while Anthony lived with Kubsch and Beth in nearby Mishawaka. Kubsch owned the family home, and he also owned 11 rental properties in St. Joseph County. They were encumbered by mortgages totaling approximately $456,000 as of mid-1998. Kubsch also had credit-card debt exceeding $16,000. He tried paying that off by refinancing four of his rental properties, but by August 1998 the credit-card debt had reached $23,000, and by September Kubsch was falling behind in his mortgage and tax payments. At about that time, he bought a life insurance policy on Beth, with himself as the sole beneficiary; the policy would pay $575,000 on her death.
The fateful day was September 18, 1998. For ease of reference, I provide a timeline of the events in Appendix A to this dissent. Here I summarize what happened that day and the evidence that pins down where the key actors were located. I rely on the evidence that was admitted at Kubsch’s second trial.
That morning, both Wayne and Beth Kubsch were up early. By 6:00 a.m., testimony from Beth’s coworker Archie Fobear established that Beth had already left her home on Prism Valley Drive in Mishawaka and was just starting to work at United Musical Instruments in Elkhart, Indiana, approximately 11 miles away. Cellular telephone records indicated that Kubsch made a call at that time from the sector just adjacent to the one covering the home. He was driving to his place of employment at Skyline Corporation, also in Elkhart; he punched in at 6:50 a.m. Cell records show that Kubsch made a telephone call at 9:11 a.m. somewhere near his workplace, and that he made another call at 10:45 a.m. from Skyline’s break room. The latter call was to the home, presumably to Beth, who had finished her shift at 10:00 a.m., returned home, and paged him twice from home around 10:30 a.m.
At 10:48 a.m., a five-minute call was placed from the Kubsch home to the home of Rick Milewski. At that point Beth left the house to run some errands. A security camera at the Teacher’s Credit Union shows Beth, along with her dog, in her car at a drive-up window at 11:08 a.m. There is a credit union receipt stamped 11:14 a.m. confirming a completed transaction. A little while later, at 11:52 a.m., Beth was with credit counselor Edith Pipke at the Consumer Credit Counseling Agency in South Bend. No evidence admitted at the second trial indicated where she was after she left the credit union and before she arrived for her appointment.
In the meantime, Kubsch drove back to the Prism Valley house after punching out from his job at 11:13 a.m. Erin Honold, a neighbor, saw him and his car in the driveway between 11:30 a.m. and noon, around the same time when Beth was speaking with the credit counselor. Telephone records from the house indicate that a call was made at 11:37 a.m. to American General Finance; Kevin Putz, an employee of the company, testified that he spoke to Kubsch that morning. Between 12:09 and 12:11 p.m., Kubsch made three more calls using his cellphone, one to the house (implying that he was no longer there) and two to Rick Milewski. He apparently interrupted Rick while Rick was speaking with his brother Dave about an upcoming hunting trip. Dave testified that Rick said that Kubsch was calling to discuss moving a refrigerator at the Prism Valley house.
Beth paged Kubsch again at 12:16 p.m.; cell records indicate that at 12:18 p.m., he called the house for 31 seconds from the vicinity of Osceola, a town between Mishawaka and Elkhart. Kubsch returned to Skyline, although he did not punch back in. He made two phone calls from the break room, one at 12:40 p.m. and the other at 1:17 p.m. Between those calls, Rick called *818 Beth at 12:46 p.m. Kubsch punched out of work again, this time for the day, at 1:53 p.m. A minute later, he called the house from Elkhart and was on the line for 46 seconds. The next call from Kubsch’s cellphone came at 2:51 p.m.; it was from a sector near the house. The state’s theory was that these last two calls bracket the time when he committed the murders— between 1:53 and 2:51 p.m.
There are some problems with this theory, at least if it is meant to encompass all three murders, because there is no evidence that Aaron left school early that day. To the contrary, witnesses testified that Aaron was waiting outside Lincoln Elementary School in South Bend and that Rick picked him up there between 2:20 and 2:35 p.m. (The school is now called Lincoln Primary Center; its website indicates that the . school day runs from 8:15 a.m. to 2:20 p.m. See Lincoln Primary Center, https:// www.edline.net/pages/LincolnJPrimary_ Center (last visited Aug. 10, 2015).) In any event, by 3:15 p.m. or so, Kubsch placed numerous calls to Beth’s mother, Diane Rasor; he eventually connected on the 11th try. Cellular records indicate that he was heading north at that point, toward the Michigan border.
Between 4:42 and 4:47 p.m. Indiana time, Kubsch made some calls picked up by the cell tower in Schoolcraft, Michigan, which is about 11 miles north of Three Rivers, Michigan, where Kubsch’s son Jonathan lived with his mother. (For the sake of consistency, I use Indiana time throughout this account; in fact, though most of Indiana and most of Michigan are in the Eastern time zone, Indiana in 1998 had not yet adopted Daylight Savings Time; thus Indiana was on Eastern Standard Time in September 1998, while most of Michigan, including Three Rivers and Schoolcraft, was an hour ahead on Eastern Daylight Time.) Around 5:00 p.m., Kubsch picked up Jonathan; he also said hello to his friend Wayne Temple around 5:30 or 5:45 p.m. at the local Kmart store. He then headed back to Osceola with Jonathan, stopping for ten minutes at the home of Constance Hardy, the mother of his friend Brad. At 5:56 p.m., he made a call from the cellular region close to the Prism Valley house.
By this time, however, Anthony had come home and discovered the bodies of Rick and Aaron. This happened at 5:30 p.m. He immediately summoned help, and so by the time Kubsch showed up at the house at 6:45 p.m., police were there and it was taped off as a crime scene. (Beth’s body had not yet been discovered.) The police took Kubsch to the station, interviewed him, and then released him. Around 9:00 p.m., they discovered Beth’s body concealed in the basement. They brought Kubsch back in for a second interview. He did not appear surprised to learn of Beth’s death. Asked several times by the officers to tell them what happened, Kubsch chose instead to invoke his right not to speak without an attorney. The police did not arrest him for the murder immediately. They did so three months later, when a person named Tashana Penn Norman told them that she and her boyfriend overheard a person saying that he had “hurt[ ] a little boy,” and she identified Kubsch as the speaker. He was arrested on December 22, 1998, and charged with all three murders.
11
A
Kubsch was tried twice in this case. The first trial took place in 2000. At its conclusion, the jury convicted him and recommended the death penalty, and the court sentenced him accordingly. The Supreme Court of Indiana reversed that *819 judgment in Kubsch I, and ordered a new trial. 784 N.E.2d at 926. The second trial took place in March 2005. Once again, the jury found Kubsch guilty and recommended the death penalty, and once again, the trial court accepted the recommendation and imposed that sentence. In Kubsch II, the Supreme Court of Indiana affirmed. 866 N.E.2d at 740. Kubsch then unsuccessfully sought post-conviction relief from the state courts, see Kubsch III, 934 N.E.2d at 1154, before turning to the federal court with his current habeas corpus petition, see 28 U.S.C. § 2254.
The State’s case, as my colleagues readily admit, was built from various pieces of circumstantial evidence. It pointed to Kubsch’s financial problems and the new life insurance policy on Beth as plausible motives for the murders. It attempted to trace his movements through use of the cellular telephone records and the testimony of the people who interacted with Kubsch, Beth, Rick, Aaron, and Anthony throughout that day. It found a fiber on the duct tape used to bind Beth’s body that matched a fiber taken from Kubsch’s car, and it also noted that the duct tape wrapper in the car matched the brand of tape used on Beth. (It offered nothing to show how common this brand was.) It (as have my colleagues) stressed the fact that Kubsch’s account of his own actions during the day was not consistent on key matters, such as whether he went home during the lunch hour, whether he was alone there, and when he headed up to Michigan. These inconsistencies, plus what the district court called a “slow-moving accumulation of a glacier of circumstantial evidence,” satisfied both the second jury and all of the reviewing courts so far that Kubsch was properly convicted and sentenced.
B
If the question before this court were simply about the sufficiency of the evidence, I would agree with everyone that Kubsch’s challenge fails. Indeed, it would be hard to find fault with the extensive discussion my colleagues have furnished. But that is not the question. It is instead whether the package of evidence that was presented to the jury was complete, and if not, whether the excluded evidence was important and reliable enough to have made a difference.
The critical evidence that was kept from the jury was videotaped testimony by a girl named Amanda (“Mandy”) Buck, “who, according to the defense, would have testified that she saw Aaron after 3:30 pm on the day of the murders.” Kubsch II, 866 N.E.2d at 730. Mandy, who was nine years old at the time, was interviewed immediately after the murders, on Tuesday, September 22, 1998. Because of the importance of what she said, I have included a full transcript of the interview as Appendix B to this dissent. The interviewer was Detective Mark Reihl; the interview took place in what appears to be a room in the police station. Mandy’s mother, Monica, was present throughout and volunteered information from time to time.
After establishing some basic information, Detective Reihl confirmed that Mandy was a fourth-grader at Lincoln School, that she lived right across the street from Aaron and his dad Rick, and that she and Aaron were “best friends.” She commented that Aaron didn’t like Kubsch, because he would' get rough and punch too hard “and stuff like that.” She saw Aaron frequently: “I always went over to his house. He always came over to my house and like we like used to study for the same spelling words.... And we would help each other on homework and stuff.” When Reihl asked her when they got out of school, she replied “two twenty.” She *820 lived close to the school, she said, just a five-minute walk away.
The interview then turned to “last Friday,” which was September 18, the day of the murders. On that day, as usual, Mandy was picked up from school by the Alphabet Academy; from there, her mother typically (and that day) picked her up to go home “[bjetween three thirty and quarter to four.” At that point Monica interjected that she “waited for [Monica’s] mom and dad to get home, and I went and cashed my check and came home.” Reihl then asked whether Monica noticed if Rick was across the street. Monica replied “I didn’t pay no attention. All I saw was Aaron.” Reihl repeated “You saw Aaron?,” and Monica said “[m]mm hmm.” She did not remember if Rick’s truck was there. Turning back to Mandy, Reihl asked again what time she got home that day. Monica answered instead, repeating “3:30 or quarter to four.” Mandy confirmed that she saw Aaron then, and that she also saw “his dad,” who “was coming from their living room into the kitchen to get something to drink.” She explained that she was able to see this from her own house: “every day when I walk home I always see Rick walk into the kitchen or walk into the restroom or walk into his room.” Asked what kind of car Rick drove, Mandy replied “[a] Chevy? He used to drive a Chevy until it broke down.” She specified that it was a black, medium-sized, “kinda short” truck. Because his truck had broken down, she added that he was driving a white truck that he had borrowed from his brother on Friday, and that the white truck was at the house when she got home from school.
Reihl next asked whether she saw Rick and Aaron leave that afternoon. She answered, “Um, yeah, like I was on my porch and, and they let me blow bubbles and I was blowin’ my bubbles, and I seen Rick pull out and leave.” She was not sure what time that was, because she left her watch in her gym bag, but she estimated it was a “medium” time after she got home, and she commented that “it takes a pretty long time to get to [Aaron’s] mom’s house.”
She then went into some detail about Aaron’s plans for the weekend. “He said that he was going to his mom’s house Friday, ’cause he was gonna stay the night there to go to the field trip Saturday____ You know he was, he — he wanted to go on the field trip bad.... But by the time Saturday when we, when we were on the bus and stuff, he was gonna be in our group, and, um, he never showed up. He wasn’t there. And we didn’t know why.” She went camping after the fieldtrip and told her grandmother that she had not seen Aaron. She learned about the murders after a news crew came to her home while she was at her karate lesson the following Monday, she said.
Reihl then turned back to Monica and confirmed that she cashed her paycheck on Friday, shortly after she came home from work (around 3:50 p.m.). She said again that she had seen Aaron, but not Rick, and that she did not look to see if Rick’s truck was there. They discussed what kind of truck Rick drove; interestingly, Mandy knew more about it than her mother — she liked the gold printing that said “Chevrolet” across the back. By then, the interview was winding down. Reihl asked Mandy yet again whether she saw both Aaron and his father, as well as the white truck, in the yard around 3:30 or 3:45 p.m., and she said yes. He asked whether “[t]hese times that you’ve given me today, uh, these are pretty accurate,” and Monica said, “Yeah, ’cause I get off work at quarter after three.” This was her daily routine. With that, the interview ended.
*821 A few days after Mandy’s interview, Reihl called Monica’s place of employment and then her home, apparently in an attempt to see yet again whether both Mandy and Monica had correctly recounted what happened and when it happened. Reihl spoke to Mandy’s grandfather (“Lonnie”) and asked him to find out if Mandy and Monica were certain about their story. Lonnie called Reihl back and told him that the events that Mandy and Monica had described had taken place on Thursday, September 17, not on Friday. The prosecutors recounted at Kubsch’s trial that Monica told the police that “her father was at her house on that Thursday, and he later reminded her that it was Thursday instead of Friday.” She said that she— Monica — had confused the dates because she was so busy; she offered no reason why Mandy would have confused them. Nor was there any effort to explain away Mandy’s detailed comments about the timing of the Saturday field trip and her subsequent camping trip, karate lesson, and so on. At that early time, not a week after the field trip, it would have been easy to confirm with the school whether the trip took place on Saturday, September 19, or Friday, September 18. (And even the trial evidence shows Rick picking up Aaron at school between 2:20 and 2:35 p.m. on Friday, strongly suggesting that there was no field trip that day.) In addition, it would have been relatively easy to confirm when Monica was paid and made her deposit, just as evidence had shown when Beth visited her own bank.
Mandy was called to testify at the second trial, but she had almost nothing to say. She claimed to have no memory of talking to the police or being interviewed by them in 1998. When Kubsch’s lawyer attempted to use the transcript of the interview to refresh her recollection and later to impeach her, the prosecution objected and the court sustained the objections. The court also refused to permit the use of the videotaped interview as a recorded recollection, despite Mandy’s asserted inability to recall anything about the interview.
C
The Supreme Court of Indiana upheld the trial court’s rulings. It found that the videotape was not admissible under Indiana’s evidentiary rule governing the use of recorded recollection, Ind. R. Evid. 803(5). In 2005 that rule covered:
[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness’s memory and to reflect that knowledge correctly....
(It essentially tracks Fed.R.Evid. 803(5), as it read before the 2011 restyling changes were made.) The court was concerned about the final element, which requires that the recording reflect the witness’s knowledge correctly. It found that Mandy’s inability to vouch for the accuracy of her prior statement precluded its use. The videotape was not admissible as a prior inconsistent statement, the court added, because Mandy gave no substantive evidence at all in her testimony, and so there was (almost) no prior statement to impeach.
The court conceded, however, that there was one statement that was subject to impeachment. At the trial, Mandy stated that “I probably didn’t see [Aaron], because I go straight [from] home to the day care, and then I would go home after-wards.” That statement directly contradicts her statement in the video that she saw Rick and Aaron that afternoon from *822 her porch, and the court acknowledged that “Kubseh should have been allowed to impeach her on this matter.” 866 N.E.2d at 735. It found the error harmless, however, because it thought that Mandy’s account from the videotape would have been impeached by the call from her grandfather suggesting a mistake in dates. It thought that the prosecutor’s ability to put Detective Reihl and Monica on the stand, presumably to support the “mistake” theory, was “also the reason why Kubsch’s claim that he was denied his federal constitutional right to present a defense fails. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (protecting defendant’s due process right by recognizing an exception to application of evidence rules where evidence found to be trustworthy).” 866 N.E.2d at 735 n. 7. At a minimum, this passage conclusively shows that the Chambers argument was adequately presented to the state courts.
Putting to one side for the moment the niceties of the rules of evidence, one thing is clear: if Mandy was correct in her videotaped interview that the events she was describing had happened on Friday, not on Thursday, and if she had seen both Aaron and Rick as late as 3:45 or 4:00 p.m. that day, then Wayne Kubseh could not have killed them. By that time, he was headed to Michigan to pick up Jonathan. The state has always pegged the time of the murders to midday, from 1:53 to 2:51 p.m. It has never argued that Kubseh arranged for someone else to commit the murders on his behalf, and it is obviously too late in the day to introduce such a radically different theory. And, because the state’s theory is that Kubseh killed Aaron and Rick because they stumbled on him as he was murdering Beth, Mandy’s testimony undermines the conviction as it relates to Beth, too.
No evidence could be more critical to Kubsch’s defense. And the possibility that the .state might have been able to impeach the videotaped account cannot cure this problem; that impeachment was itself subject to impeachment from such details as the school’s records about the day of the field trip and the date when Monica cashed her paycheck. Under these circumstances, the Supreme Court’s decision in Chambers overrides the state evidentiary rule that prevented the jury from hearing Mandy’s statement. This was evidence that, if believed, might have prompted the jury to acquit on one or more of the counts. As I explain below, the Indiana Supreme Court’s decision to the contrary was, in my view, contrary to and an unreasonable application of Chambers, even under the strict standard of review that applies, which my colleagues discuss in such detail despite our agreement on that point.
Ill
Habeas corpus petitioners come to a federal court of appeals with at least two strikes against them: they already have lost in the state courts (either on the merits or because of one of many procedural hurdles that must be cleared); and they also have failed to convince the federal district court of their entitlement to relief. They face the daunting burden of satisfying the familiar and deliberately demanding standards created in the Antiterrorism and Effective Death Penalty Act (AED-PA), 28 U.S.C. § 2254(d), under which
An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of' a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
(1) resulted in a decision that was contrary to, or involved an unreasonable *823 application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d); see Harrington v. Richter, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (“If this standard is difficult to meet, that is because it was meant to be.”).
Kubsch therefore has the burden of showing that the last court in Indiana to speak to his case, see Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), rendered a decision that was either contrary to, or an unreasonable application of, “clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). (He has not sought to rely on 28 U.S.C. § 2254(d)(2), which deals with unreasonable determinations of fact, and so I do not discuss that option here.) As we observed in Lindh v. Murphy, 96 F.3d 856, 873 (7th Cir.1996) (en banc), reversed on other grounds, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), Congress deliberately restricted the jurisprudence to which a court faced with a habeas corpus petition may resort: only federal law as determined by the Supreme Court is available. This restriction acknowledges that the state supreme courts are equally responsible (along with the lower federal courts) for applying federal law, and that the only federal court whose rulings bind them is the federal Supreme Court.
With that in mind, I turn directly to the Supreme Court decision that controls Kubsch’s case: Chambers v. Mississippi Chambers and the line of cases that follow it “clearly establish” (to use AEDPA’s term) the fact that a state rule of evidence cannot be used in a way that denies aii accused person his right under the Due Process Clause to a fair trial, in which he has a fair opportunity to defend. My detailed look at that case and those that followed it demonstrates why, contrary to the spin my colleagues have tried to place on it, the position I take is not opening up any floodgate for the use of hearsay evidence. Only evidence that satisfies the strict criteria of Chambers will be admissible, and to see what that evidence must be like, it is necessary to recall the particulars of the case.
Petitioner Leon Chambers was tried by a jury in Mississippi state court and found guilty of murdering a policeman; he was sentenced to life imprisonment. The story leading up to his conviction was sadly familiar. On a Saturday evening, Woodville (Mississippi) police officers Forman and Liberty went to a local bar to execute an arrest warrant for a young man named Jackson. With the help of a hostile crowd and some 20 to 25 men, Jackson resisted arrest. Forman then radioed for assistance, while Liberty retrieved his riot gun from the squad car. Three deputy sheriffs soon arrived in response to Forman’s call, but the situation was still not under control. Shooting broke out while Forman was looking away, but when he turned to check on Liberty, he saw that Liberty had been hit several times in the back. Before Liberty died, he turned and fired toward the place where the shots had come from. His second shot hit a man in the crowd in the back of the head and neck; the injured man turned out to be Chambers.
Forman saw neither who shot Liberty, nor whether Liberty managed to hit anyone. A deputy sheriff later testified that he saw Chambers shoot Liberty, and another deputy sheriff testified that he saw Chambers make a suspicious arm movement shortly before the shots were fired. *824 At the time, however, the remaining officers were trying to tend to Liberty. They put him in the police car and rushed him to a hospital, but he was declared dead on arrival. Chambers in the meantime was lying on the ground. Returning to the scene, some of his friends discovered that he was still alive and took him to the same hospital, where he was treated and then arrested. Later he was charged with Liberty’s murder.
Another man, Gable McDonald, was also in the rowdy group at the bar. A few days later, he left his wife in Woodville and moved to Louisiana, where he found work. Five months later, he returned to Wood-ville to see an acquaintance, Reverend Stokes. After talking to Stokes, McDonald met with Chambers’s attorneys and gave them a sworn confession that he was the one who shot Liberty. He also said that he had told a Mend, James Williams, that he was the killer. He admitted that he used a nine-shot, .22-caliber revolver, which according to the autopsy was the murder weapon. McDonald signed the confession, surrendered to the police, and was put in jail.
A month later, at the preliminary hearing, McDonald recanted. His new story was that Stokes had persuaded him to make a false confession; the idea, implausible though it sounded, was that Stokes promised he would not go to jail for the crime and that he would share in the proceeds of a lawsuit Chambers planned to bring against the town. The local justice of the peace accepted the recantation and released McDonald.
Chambers’s trial took place the next year. He had two theories of defense: first, he tried to show that there was no evidence indicating that he shot Liberty; second, he wanted to show that the real culprit was McDonald. He was stymied in the latter effort, however, by the confluence of two Mississippi rules of trial procedure. First, because the prosecutor refused to call McDonald as a witness, he was forced to call McDonald himself. This triggered Mississippi’s voucher rule, under which the party who calls a witness is forbidden to impeach him. Following that rule, the trial court refused to allow Chambers to treat McDonald as an adverse witness. Second, his effort to use three other witnesses to whom McDonald had confessed was blocked by the hearsay rule. Chambers was prepared to show that each of those three would testify that McDonald unequivocally said that he shot Liberty. Much of their testimony was corroborated.
The Supreme Court found that the combination of these two rules of state procedure resulted in a fundamentally unfair trial for Chambers. The rules rendered him utterly unable to subject McDonald’s repudiation and alibi to cross-examination, and they prevented him from putting before the jury the information that would have allowed them to decide whether to believe McDonald. The voucher rule, the Court held, “as applied in this case, plainly interfered with Chambers’ right to defend against the State’s charges.” 410 U.S. at 298, 93 S.Ct. 1038. The Court found no need to decide whether that interference alone would have been enough, because it also found that when one added the effects of the hearsay rule to the mix, there was no doubt that Chambers’s constitutional rights were violated. It noted that the hearsay statements “were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability.” Id. at 300, 93 S.Ct. 1038 (spontaneous, corroborated, independent, against McDonald’s penal interest). McDonald was present in the courtroom, under oath, and subject to cross-examination. The Court summarized its holding with these words: “In *825 these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.” Id. at 302, 93 S.Ct. 1038.
The Court did not abandon Chambers the minute it was decided in 1973. To the contrary, as my colleagues concede, over the ensuing years the Court has carefully reviewed a substantial number of cases in which Chambers arguments have been made. Some decisions have found that state rules must give way to the fundamental dictates of due process, while others have concluded either that the evidence is not so critical, or that the rule as applied does not deprive the defendant of a fair trial. Even in the latter cases, however, the Court has confirmed its continued adherence to Chambers.
For example, in Nevada v. Jackson, — U.S.-, 133 S.Ct. 1990, 186 L.Ed.2d 62 (2013), the defendant argued in a sexual assault ease that a Nevada statute that precludes the admission of extrinsic evidence for impeachment purposes violated the Chambers principle. The Court rejected that argument and held that Nevada was entitled to apply its statute. Nevertheless, however, it said:
[ojnly rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. See [Holmes v. South Carolina,] 547 U.S. [319], 331, 126 S.Ct. 1727, 164 L.Ed.2d 503 [ (2006) ] (rule did not rationally serve any discernible purpose); Rock v. Arkansas, 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (rule arbitrary); Chambers v. Mississippi, 410 U.S. 284, 302-303, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (State did not even attempt to explain the reason for its rule); Washington v. Texas, 388 U.S. 14, 22, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (rule could not be rationally defended).
133 S.Ct. at 1992.
Indeed, only three years before Jackson the Court found an application of Chambers to be so uncontroversial it addressed the matter in a per curiam opinion. Sears v. Upton, 561 U.S. 945, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010). In that case, evidence of petitioner Sears’s cognitive impairments had not been brought to light in state court during his capital sentencing hearing. The Court first found that the state court had not applied the correct standard for ascertaining prejudice for purposes of a Sixth Amendment claim of ineffective assistance of counsel. Id. at 946, 130 S.Ct. 3259. It then said that “the fact that some of such evidence may have been ‘hearsay’ does not necessarily undermine its value — or its admissibility — for penalty phase purposes.” Id. at 950, 130 S.Ct. 3259 (footnote omitted). In the accompanying footnote, it added this: “Like Georgia’s ‘necessity exception’ to its hearsay rules, ... we have also recognized that reliable hearsay evidence that is relevant to a capital defendant’s mitigation defense should not be excluded by rote application of a state hearsay rule.” Id. at 950 n. 6, 130 S.Ct. 3259.
As the citation to Holmes in Jackson signals, the Court has not shrunk the Chambers principle to one that applies only to sentencing proceedings, in which the normal rules of evidence do not strictly apply. In Holmes, the question was “whether a criminal defendant’s federal constitutional rights are violated by an evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict.” 547 U.S. at 321, 126 S.Ct. 1727. Yes, the Court concluded, the defendant’s rights are violated by such an *826 evidence rule, despite the broad latitude that state and federal rulemakers enjoy. It continued as follows:
Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense .... This right is abridged by evidence rules that infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve.
Id. at 324, 126 S.Ct. 1727 (quotation marks and citations omitted). One of the Court’s illustrations of this principle was Chambers. Id. at 325, 126 S.Ct. 1727.
Naturally, there are cases in which defendants have contended that they should be entitled to the benefits of the Chambers rule and the Court has turned them down. See, e.g., Fry v. Pliler, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (cumulative evidence can be excluded); Clark v. Arizona, 548 U.S. 735, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006) (state entitled to limit issues for which evidence of mental illness and capacity may be used); Oregon v. Guzek, 546 U.S. 517, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006) (no right to present evidence at sentencing phase that casts “residual doubt” on conviction); United States v. Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (permissible to prohibit defendant in a court-martial from relying on polygraph evidence). -But it is no surprise that defendants have tried to test the outer limits of Chambers. Sometimes the Court has acknowledged the Chambers rule but found other reasons why the defendant could not prevail. See Taylor v. Illinois, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (stressing nevertheless the importance of ensuring that the jury does not decide based on a distorted record). And, in addition to the cases already discussed, there are others in which defendants have prevailed. See, e.g., Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (refusing to allow Arkansas to use a per se rule excluding all hypnotically refreshed testimony); Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (exclusion of evidence of physical and psychological circumstances of defendant’s confession deprived petitioner of fair trial); Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam) (application of hearsay rule violated due process even though correct as a matter of Georgia law).
Chambers, in short, establishes a rule that binds state and federal courts alike. It ensures the fundamental fairness of a defendant’s trial. Its message is especially strong in our case, which, like Chambers itself, concerns a defendant’s right to demonstrate his innocence on capital charges. Just as in Chambers, in Kubsch’s case even though the videotaped evidence of Mandy’s interview was technically hearsay (the very same rule of evidence at issue in both Chambers and Green), it was created in a way that provided substantial assurances of its accuracy. It missed qualifying for the “recorded recollection” exception to the hearsay rule by a hair. It included numerous details that were either undisputed {e.g., Mandy was a friend of Aaron’s; she lived across the , street from him; they went to the same school) or easily subject to corroboration. As I now show, these are precisely the circumstances in which the Court has found that the evidentiary rule must give way to the defendant’s due process right to a fair trial.
IV
A
I begin with what may be the strongest reason for admitting the Mandy videotape: *827 its quality as a de facto recorded recollection. (I say “de facto ” out of respect for the Indiana Supreme Court’s ruling that it fell short, not because I would necessarily have come to the same conclusion.) As I noted earlier, at the time of Kubsch’s second trial, Indiana Rule of Evidence 803(5) read as follows:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... (5) Recorded Recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness’s memory and to reflect , that knowledge correctly.
This rule, along with Indiana’s other rules of evidence, had been adopted in 1994. It was intended to codify the common-law exception to the prohibition against the use of hearsay evidence for records of past statements about which the witness has no present memory. By requiring only “insufficient” recollection, the rule as adopted relaxed Indiana’s common-law doctrine, which had required the complete absence of any memory as a condition of admissibility. Indiana Proposed Rules Of Evidence 75 (1993); see also Fed.R.Evid. 803(5) Committee Note (the model for the Indiana rule), (discussing “[t]he guarantee of trustworthiness ... found in the reliability inherent in a record made while events were still fresh in mind and accurately reflecting them”). The key is that the circumstances surrounding the preparation of the record make it particularly reliable. Indiana Proposed Rules Of Evidence 75. The rule itself does not specify how the accuracy of the recorded version should be proved. The Indiana Supreme Court in Kubsch II, however, took the position that the witness must somehow vouch for its accuracy. See also 2 McCormick On Evidence § 283 (7th ed.2013). That can be difficult, since by definition the witness does not recall making the statement, but common practice, conformity with other things the witness knows, or even a statement such as “I would not have lied about that” typically satisfy the vouching requirement. See generally 30C Michael H. Graham, Federal Practice And Procedure § 7046 at 115-16 & n.4 (interim ed.2011).
In applying Rule 803(5), Indiana courts both before and, after the various Kubsch opinions have looked to see if the recorded recollection (1) relates to a matter about which the witness once had knowledge; (2) is one about which the witness now has insufficient recollection to permit her to testify fully and accurately at trial; (3) is one that the witness is nonetheless willing and able to adopt or vouch for; (4) is one made when the matter was fresh on her mind; and (5) correctly reflects the witness’s knowledge at the time of the event. E.g., Impson v. State, 721 N.E.2d 1275, 1282-83 (Ind.Ct.App.2000). The final requirement is inevitably awkward, because there is tension between the ability to vouch and the inability to recall. But Indiana courts have resolved that tension by adopting a realistic approach to vouching; they have accepted even a simple statement that the report is accurate. E.g., ARM. v. State, 968 N.E.2d 820, 827 n. 7 (Ind.Ct.App.2012); see also Gee v. State, 271 Ind. 28, 389 N.E.2d 303, 309 (1979) (“At the time of his testimony he may have completely forgotten the event ... but at that time he can vouch for the accuracy of the prior writing.”). In one case, the court was satisfied when a witness testified that she “told the truth in her videotaped statement.” Horton v. State, 936 N.E.2d 1277, 1283 (Ind.Ct.App. 2010), vacated on other grounds, 949 *828 N.E.2d 346 (Ind.2011). And at times, the courts have simply assumed that the report in question accurately reflects the witness’s knowledge at the time of the report. See, e.g., Small v. State, 736 N.E.2d 742, 745 (Ind.2000) (permitting admission of deposition answers because witness could not recall making specific statements in the deposition, but failing to address whether witness affirmed that she was truthful at the time of the deposition); Smith v. State, 719 N.E.2d 1289, 1291 (Ind.Ct.App.1999) (stating only that “the report reflected [the witnesses knowledge correctly” without explaining why).
It is easy to see why an endorsement from the witness would be important for many types of recorded recollection, such as diaries, letters, written reports, memoranda, or data compilations. A witness might be able to authenticate her signature, or her habit of writing every evening in a diary, or her acquaintance with the purpose and recipient of a memorandum, without necessarily remembering what was said as a matter of substance. And this kind of vouching serves an important purpose for those kinds of records, because there is nothing otherwise to ensure that it is this witness’s recollections that were recorded.
I recognize, however, that it is not up to this court to decide whether the Supreme Court of Indiana correctly interpreted its own rule of evidence. This is so even though that court barely touched on the reason why the videotape was inadmissible. Here is the entirety of its explanation for the conclusion that the final element of Indiana’s Rule 803(5) was not satisfied:
Buck testified twice that she had no memory of being interviewed by the police in 1998. (Trial Tr. at 2985.) As a result, the trial court correctly denied Kubsch the opportunity to read Buck’s statement into evidence, because Buck could not vouch for the accuracy of a recording that she could not even remember making.
Kubsch II, 866 N.E.2d at 734-35. This merely describes the fact that this was a matter “about which [the] witness once had knowledge but now has insufficient recollection” to permit full and accurate testimony. Indiana made clear at the time it adopted Rule 803(5) that “insufficient” recollection includes no recollection at all. There is thus no reason to think that the total absence of recollection precludes the use of the rule.
The Indiana Supreme Court did not express any doubt that the other requirements of Rule 803(5) were satisfied. For purposes of Chambers, then, we have a situation in which the state hearsay rule was used to block critical evidence. There were, however, just as in Chambers, substantial assurances of reliability of this evidence, which I discuss below. This was therefore a situation in which the due process command expressed in Chambers should have overridden the state’s evidentiary rule.
B
Putting Chambers temporarily to one side, the fact that the showing at trial was inadequate to satisfy the letter of Rule 803(5) takes us to one of Kubsch’s other theories: that he received ineffective assistance of trial counsel in a number of respects, including “in their attempt to admit Amanda Buck’s videotaped statement.”[1] *829 Counsel failed to take any of a number of readily available steps to meet the requirements of Rule 803(5) — steps that were necessary, under Wiggins v. Smith, for effective assistance of counsel. Indiana courts require that the witness whose recollection has faded need only tell the finder of fact that her statements in the recording were accurate. Kubsch’s attorneys never asked Mandy that question. Instead, they dropped the subject after establishing the fact that she could not recall speaking to the police, which relates to a different requirement of the rule (one that was easily met). They should have asked her whether she would have told the police the truth if such an interview had taken place, but they did not. They could have shown her the beginning of the videotape on the record — the trial transcript indicates they showed Mandy the tape off the record but never put her back on the stand afterward — and asked her whether she was the girl depicted in the recording. They could have asked Monica or anyone else who knew Mandy well about her reputation for truthfulness. Any of these steps, and certainly all of them taken together, would have met the requirements Indiana courts have set for compliance with Rule 803(5)’s requirement for evidence that shows that the recording reflects the witness’s knowledge correctly.
Counsel also could have taken steps to counteract the trial court’s assumption that it would have been so easy to impeach Mandy’s videotaped account that any error in refusing to allow it as a prior inconsistent statement would have been harmless. The state urged that this was the case based on the telephone call from Mandy’s grandfather, Lonnie, a few days after the interview urging the police to disregard her statements because she was supposedly mistaken about the day she was talking about. According to Lonnie, everything Mandy recounted had happened on Thursday, September 17, not on Friday the 18th. But there is no reason to conclude, without any adversarial testing, that Lonnie was correct. No evidence at all indicates how reliable his source of information for that statement may have been. He may have been trying to extricate his granddaughter from involvement in the murder trial, or he may have had some other motive that no one ever explored.
Had counsel for Kubsch been on their toes and complied with their duty to investigate in conformity with Wiggins, there are many ways in which they could have rehabilitated Mandy’s very clear testimony (see Appendix B) that she was recalling the events of Friday, just four days earlier than the interview. Anyone who watches the video can only be impressed by how articulate, bright, and forthcoming Mandy is in it. If there were some concern about the fact that Mandy was nine years old at the time, counsel could have put Mandy’s *830 mother, Monica, on the stand and asked on what day of the week she was paid and whether she possibly could have been depositing her paycheck on a Thursday. Records from Monica’s bank could have been subpoenaed to see when that deposit was made, and additional evidence such as security camera footage could have shown the day on which she was there. The school district could have been subpoenaed for records confirming on what day the field trip that Mandy discussed in detail actually took place. Kubsch’s counsel did none of these things.
My colleagues dismiss the video as unreliable, but saying so does not make it so. In fact, many factors support the reliability of this video, both for purposes of substantive evidence and for purposes of impeachment:
• It was created only four days after the events about which both Mandy and Monica were speaking.
• Because the method of recording the recollection was video, rather than audio or writing, there was no chance that the identity of the speakers nor the content of their statements could be mistaken.
• Mandy provides an elaborate timeline and describes small details 'from her direct observations of the victims at their home.
• Mandy’s mother, Monica, was present throughout the interview and provided corroborating details at numerous points.
«Neither Mandy nor Monica had any personal interest in .the case; there was thus no reason to fear that their accounts were slanted one way or the other.
• Both Mandy and Monica were available at trial to testify after the video was shown, at which point the jury would have been able to weigh then-live statements at trial against their recorded statements on the video.
The failure to take steps that would have allowed the videotape to be admitted for all purposes pursuant to Indiana Rule 803(5), and that would also have permitted its use to impeach Mandy’s statement at trial that she “probably didn’t see” Aaron that afternoon, amounted to insufficient performance for purposes of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It also severely prejudiced Kubsch. Mandy’s videotaped testimony, if believed, would have shown that the murders of at least Rick and Aaron, and probably Beth (on the theory that Rick and Aaron interrupted the assault on Beth), took place at a time when Kubsch was already in or on his way to Michigan to pick up Jonathan. This was easily Kubsch’s strongest defense to the charges, and it was swept away by a combination of the trial court’s evidentiary rulings and counsel’s ineffectiveness.
C
The majority argues that despite the inherently credible nature of the video and Mandy’s statements on it, there were three other primary reasons for concluding that it was not reliable enough to meet the Chambers standard for use at trial: first, that Mandy’s statements were not corroborated; second, that she was “essentially unavailable” for cross-examination; and third, that Detective Reihl “never pushed” Mandy on “critical details” during the 1998 interview, such as whether she had her dates and times correct. Ante at 799-801. I begin with the last contention. A review of the transcript at Appendix B shows that this is simply not the case. The majority posits that Reihl “was simply taking [Mandy’s] account as she spoke,” but Reihl repeatedly stops and “pushes” Mandy to con *831 firm what she is saying. He asks her over and over whether she is talking about Friday’s events. {E.g., “[D]o you remember last Friday?” “And did they pick you up Friday?” “Was that white truck at Rick’s house Friday?” “Friday, after you got home, they left just a little bit after when you got home, right?”) At the end of the interview, Reihl turns to her mother, Monica, and asks again for assurance: “[tjhese times that you’ve given me today, uh, these are pretty accurate?” Monica responds that they were, “pretty well,” because “sometimes I have to stay a couple minutes after, so, I get home a little later. And that was just so happen [sic ] to have been one of the days that was a little bit later.” It is also clear from the transcript that this was not the first time Monica and Mandy had spoken to Reihl about that past Friday’s events. At various points, Reihl indicates that he was following up on a conversation they had previously “at the house.” Given these repeated assurances, there was little reason for Reihl a day later to ask the two interviewees yet again “about the possibility that her memory had confused events of two different days,” as the majority suggests is necessary to meet the requirements of Chambers. Ante at 807. For all we know, Reihl did not like what he was hearing and was hoping that they would change their story.
The majority also understates the degree of corroboration for Mandy’s account in the videotape (as I have said, corroboration that is just as good as that found in Chambers itself). Mandy’s own mother interjects corroborating remarks repeatedly during the interview. My colleagues push this to one side because they believe that Monica’s subsequent off-the-record, non-testimonial statement to police that she (but not Mandy) had the wrong day effectively erased Monica’s own consistent corroboration in the video. The transcript provides no support for this interpretation. To the contrary, Monica is an active participant who provides her own detailed account of her afternoon on that Friday. Like Mandy, Monica herself saw Aaron after school, even though she did not see Rick. (No one thinks that Aaron and Rick took separate cars to the Kubsch house; Aaron was far too young to drive.) And, as I already have, pointed out, there was much more corroboration easily within reach.
Last, some precision is necessary with respect to Mandy’s availability for cross-examination. She was not “unavailable” in the sense of not being present at trial. She was in the courtroom and she testified; at least one aspect of her testimony, as the Indiana Supreme Court acknowledged, should have been impeached by her statements on the video. She was “unavailable” only because her memory had failed. But that is true of every witness proffered under Rule 803(5). Indiana courts, like others, look for the next-best assurances.' Mandy never claimed that she was not the girl on the tape, nor has the state ever argued that the “Monica” on the tape was not Mandy’s mother. There was, in short, ample corroboration even on the record that exists to satisfy this aspect of the Chambers rule. The majority sees no way to distinguish this hearsay from the ordinary mine-run of hearsay, and it accuses me of throwing the door open to admission of every recorded police interview. Not so. In many cases, the witness will have a good enough recollection of what happened that Rule 803(5) will never come into play. In many cases, the proffered hearsay will be cumulative or relevant only to a peripheral matter. In the great majority of cases, the admission of the hearsay statement will not have life-or-death consequences. The dissent in Chambers worried about exactly the same *832 things the majority here invokes. But the dissent did not prevail, and the Supreme Court has continued to follow Chambers in the small group of cases to which it applies. This court should not be second-guessing the Supreme Court, but I fear that is what the majority has done. Under its view, Chambers will never apply to allow a defendant to introduce pivotal evidence, if a state rule would block it. By so ruling, it is contravening the Supreme Court’s command that “the hearsay rule may not be applied mechanistically to defeat the ends of justice.” Chambers, 410 U.S. at 302, 93 S.Ct. 1038.
In fact, this case is as close to Chambers as anyone is likely to find. My colleagues misapply the Supreme Court’s guidance in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O’Connor, J.), when they insist on a precise factual match between Chambers and the present case. The Court has never insisted on factual identity between its earlier case and the new one. See id. at 407, 120 S.Ct. 1495 (“[A] state-court decision also involves an unreasonable application of this Court’s precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.”) (emphasis added). Kubsch’s situation, while differing in some details from Chambers’s, is close enough to require application of the same principle.
The majority fears that if Chambers requires admission of the videotape, then state hearsay rules are out the window. But their gripe is with the Supreme Court, not with me. I have shown why and how the facts cabin this case. In very few matters before the court will the price of insisting on exclusion of evidence that does not fit every technical requirement of the state’s hearsay rule be death. That alone should lay to rest any fears that granting Kubsch relief under Chambers will produce the “sweeping” result the majority fears. Like defendant Chambers, Kubsch was “thwarted in his attempt to present this portion of his defense by the strict application of certain [state] rules of evidence.” Chambers, 410 U.S. at 289, 93 S.Ct. 1038. In Kubsch’s case, the hearsay problem was compounded by the ineffectiveness of counsel’s efforts to get the tape admitted.
In Chambers (also a murder trial), the application of the state’s rules on vouching for witnesses and hearsay prevented the defendant from calling as an adverse witness the person who he said was the real murderer and three witnesses who would have supported that proposition. The state excluded that evidence notwithstanding the fact that it was created “under circumstances that provided considerable assurance of [its] reliability.” Id. at 300, 93 S.Ct. 1038. Those circumstances included the fact that the confessions of the apparent murderer to which each excluded witness was prepared to testify were “made spontaneously to a close acquaintance shortly after the murder had occurred”; each was corroborated by other evidence in the case; and each was self-incriminatory and against the speaker’s interest. Id. at 300-01, 93 S.Ct. 1038. The alleged true murderer “stood to benefit nothing by disclosing his role in the shooting,” and he was in the courtroom during the trial and so could have been cross-examined by the state and evaluated by the jury. Id. at 301, 93 S.Ct. 1038.
Mandy and Monica Buck were not potential suspects in this case, but their videotaped statements bore equally compelling indicia of reliability. The majority downplays these facts, but they overlook the significant ways in which the Supreme *833 Court itself has confined Chambers. Granting the writ to Kubsch under Chambers would not abolish the rule against hearsay, any more than Chambers abolished hearsay and vouching, the two rules at issue there. A set of very particular circumstances must arise to produce a case like Kubsch’s, or like that in Chambers. As I already have pointed out, a result in Kubsch’s favor would not lead to the admissibility as substantive evidence of “all hearsay of this type [videotapes?],” to use the majority’s words, ante at 808.
In this case, the operation of Indiana’s hearsay rule, coupled with counsel’s inadequate efforts with regard to the tape, prevented Kubsch from showing that he could not have been the murderer. Like Chambers, Kubsch also tried to show that someone else was the guilty party — in Kubsch’s case, his sometime friend Brad Hardy. There appears to have been significant evidence pointing to Hardy. Indeed, at one point the state had charged him with conspiring with Kubsch to commit the murders and with assisting a criminal (Kubsch). Kubsch II, 866 N.E.2d at 731. Hardy wound up testifying against Kubsch in the first trial; interestingly, the state did not drop the charges against him until two years later.[2] The excluded videotaped evidence in Kubsch’s case had even greater guarantees of reliability than the evidence before the Supreme Court in Chambers. And the exclusion of the videotape drastically undermined Kubsch’s ability to demonstrate that someone else must have committed the three murders. The Chambers exception exists for just this kind of case. In my view, the Indiana courts’ refusal to recognize and apply it amounts to constitutional error that must be recognized, even under the demanding standards of 28 U.S.C. § 2254(d)(1).
V
Wayne Kubsch may be a disagreeable man, as Mandy said in her videotaped statement. His business skills may have been bad, and he may, as of September 1998, been flailing around for a way to solve his financial problems. And a jury with all of the evidence before it may have convicted him for the murders of Beth, Rick, and Aaron, if it had been persuaded that Mandy’s videotaped testimony was not worthy of belief for some reason. But a jury with all of the evidence before it may also have concluded that Kubsch, no matter what his other flaws, could not have committed those murders because Rick and Aaron, and perhaps Beth, were still alive at 3:45 p.m., when Kubsch was already far from the house driving to Michigan. We will never know, because my colleagues are unwilling to find either the disregard or incorrect application of Chambers here, nor do they perceive ineffective assistance of counsel. I cannot subscribe to that result. I therefore respectfully dissent from the decision to affirm the district court’s denial of the writ and the consequent green light for Kubsch’s execution.
APPENDIX A
Timeline of events, September 18, 1998
Time Kubsch Beth/Others
*834 6:00 am Near Mishawaka home (cell record)._ Beth is at work in Elkhart (United Musical Instruments).
6:50 am At work in Elkhart (Skyline Corn.)._
9:11 am Cellphone call near work.
10:00 am Beth finishes shift and goes home.
10:30 am Beth pages Kubsch twice from home.
10:45 am Call to Beth from Skyline break room._
10:48 am Beth makes a call from home to Rick’s house._
10:53 am Beth goes out to run errands. -
11:08 am Security camera at Teach-er’s Credit Union shows Beth with the dog in the car._
11:13 am Kubsch punches out of work.
11:14 am Beth’s credit union receipt shows transaction completed._
11:30 am to noon Kubsch at home (seen by Erin Honold)._
11:37 am Call from home to American General Finance,__
11:52 am Beth meets with credit counselor Edith Pipke in South Bend._
12:09 to 12:11 pm Kubsch makes 1 call to house and 2 calls to Rick (cellphone)._
12:16 pm Beth pages Kubsch again.
12:18 pm Kubsch calls the house (31 seconds) from Osceola (toward Elkhart)._
12:40 pm Kubsch calls house from break room at Skyline._
12:46 pm Rick calls Beth at home.
1:17 pm Kubsch calls house from break room at Skyline._
1:52 pm Kubsch punches out again and does not return.
_ 1:53 pm Kubsch calls home from Elkhart area (46 seconds)._
2:20 to 2:35 pm Rick picks up Aaron from school in South Bend.
2:51 pm Kubsch makes call from near home (cell records)._
3:15 pm Kubsch calls Beth’s mother from Elkhart (after 10 tries). Cell sectors indicate he is heading toward Michigan._
3:45 to 4:15 pm Approximate time when Mandy saw both Aaron and Rick at their South Bend home._
*835 4:42 to 4:47 pm Kubseh makes calls near _Schoolcraft, MI._'
5:00 pm Kubseh picks up son Jonathan in ___Three Rivers, MI._._
5:30 to 5:45 pm Kubseh sees Wayne Temple at _Kmart in Three Rivers._
5:30 to 6:30 pm Kubseh and Jonathan stop in Osceola at home of _Constance Hardy._
5:30 pm - Anthony discovers the bodies of Rick and Aaron Milewski at the _house. _
5:56 pm Kubseh makes phone call on _network close to the house._
6:45 pm Kubseh returns home; police are there; he goes to station for first _interview._
9:00 pm Police discover Beth’s body in basement; they bring Kubseh _back to the station._
After 9:00 pm Kubseh interviewed second time by police; he invokes Miranda _rights._
APPENDIX B
Transcript of Police Interview with Monica and Mandy Buck September 22, 1998
Det. Mark Reihl: [Inaudible] stepped out for a minute. I’ll go ahead and start asking you a couple questions. Okay, and the time is now three o’clock PM. And, today is September the twenty-second, nineteen ninety-nine — nineteen ninety-eight. And Mandy, is it M-a-n-d-y?
Mandy: Uhhuh.
Reihl: M-a-n-d-y. Buck. B-u-c-k?
Mandy: Uh huh.
Reihl: And you’re how old?
Mandy: Nine.
Reihl: Your birthdate is?
Mandy: Ninety-eight. Nineteen ninety-eight. Oh, nineteen eighty-nine.
Reihl: This is nineteen ninety-eight.
Mandy: Nineteen eighty-nine.
Reihl: What month were you born?
Mandy: February.
Reihl: February. What day?
Mandy: Eighth.
Reihl: Nineteen eighty-nine.
Mandy: Yeah.
Reihl: .Alright.
Mandy: But you can ask my mommy on that. I think so.
Reihl: Oh, I’m pretty sure, all right? You’re pretty intelligent. I think you know.
Mandy: Yeah, I think that, yeah yeah yeah.
Reihl: Mandy was born February the eighth?
Monica: Yeah.
Reihl: Nineteen eighty-nine?
Monica: Mmm hmm.
Reihl: Okay.
Mandy: Cool, I got it right.
*836 Reihl: See, you got it right. Okay. And your mother’s name is Monica?
Mandy: Uh huh.
Reihl: M-o-n-i-c-a? Correct me?
Monica: Yeah.
Reihl: Buck. And you live at thirteen twenty East Indiana in South Bend.
Mandy: Uh huh.
Reihl: And your home phone is two three three, seven seven three seven?
Mandy: Two three three seven seven three seven. Yep.
Reihl: Right. And you go to Lincoln School?
Mandy: Yeah.
Reihl: And you’re in which grade?
Fourth?
Mandy: Yeah.
Reihl: Okay. How’s school this year?
Mandy: Umm, good, even though I have the teacher that, um, is the Wicked Witch of the West, she’s fine. She’s okay.
Reihl: Well sometimes they gotta be like that so you kids will listen.
Mandy: Yeah.
Reihl: Okay. Well, the reason you’re here is that you live right across the street—
Mandy: Prom Aaron?
Reihl: From Aaron and his dad Rick. Mandy: Yeah.
Reihl: Okay. And you and Aaron were pretty good Mends, huh?
Mandy: Best friends, yeah.
Reihl: Best friends?
Mandy: [Nods head]
Reihl: How long have you known Aaron?
Mandy: I don’t know. I think he moved there in like the beginning of May I think.
Just beginning. I don’t know. I never kept track of it. I don’t know. ’Cause he told me one day and then I just forgot.
Reihl: Oh, that’s okay.
Mandy: I can’t remember I think—
Reihl: Time just goes by so fast, doesn’t it? And you said that Aaron used to talk sometimes about things that made him sad?
Mandy: Mmm hmm. [Nods head]
Reihl: Made him upset?
Mandy: Right, and like he, he he wished his mom didn’t break up with his dad and like go with Wayne. He was like, he didn’t like Wayne.
Reihl: Aaron didn’t like Wayne?
Mandy: No.
Reihl: Well how come?
Mandy: Um because, like, he would get rough with him and stuff and punch him too hard and stuff like that.
Reihl: Was it because — did he ever say was it because Wayne was mad at him or were they just playing?
Mandy: He never said, he never said why he didn’t like him he just said like, he just said he just didn’t like him because Wayne was just like too rough and stuff.
Reihl: Okay. Did he ever say if Wayne ever was rough with his mom?
Mandy: No.
Reihl: You didn’t talk about that?
Mandy: No.
Reihl: Okay. What else did you guys talk about?
Mandy: Um, we talked about like, why he moved here and like what we wanted to be when we got older and, um, who are our Mends and where we used to live and, like, and I introduced him to my parents; he *837 introduced me to his dad. Then we just became best friends.
Reihl: That’s great.
Mandy: I always went over to his house. He always came over to my house and like we like used to study for the same spelling words. He’d give me my spelling words and I would give him his spelling words. And we would help each other on homework and stuff. We were pretty good friends.
Reihl: That’s, that’s wonderful.
Mandy: We got along really good.
Reihl: He’s a pretty good kid, huh?
Mandy: Mmm hmm. [Nods head]
Reihl: Smart?
Mandy: Uh huh. [Nods head] He knew, he knew his times pretty good. He could, he could just do ’em in a flash. He was pretty good at ’em. He’s a lot better than me.
Reihl: Did you, did you say you used to walk to school with him sometimes?
Mandy: Uh no, I never walked.
Reihl: Oh, you never did.
Mandy: No. I see — I seen him walk to school.
Reihl: Uh-huh.
Mandy: I never walked to — I never
walked to school or to my house alone.
Reihl: Okay, and how would he get home?
Mandy: Um, usually some, if he wasn’t grounded from his bike would ride his bike home. He would walk home. His dad would come and pick him up when he had his truck. Um, - Rick would walk to school and pick up Aaron. They would walk back home together.
Reihl: Mmm hmm. And, and you guys get out of school at what time?
Mandy: Two twenty.
Reihl: Two twenty. And how long does it take him to get home do you think?
Mandy: Mmm probably like — we don’t live too far from Lincoln. All you gotta do is go straight and turn and you’re there. Reihl: Oh.
Mandy: Probably like five minutes to get there.
Reihl: Uh — huh. Okay.
Mandy: If he was riding his bike it would only take him like two minutes. But if he was walking it would probably take him a pretty long time.
Reihl: Mmm hmm. Now, do you remember last Friday?
Mandy: Yeah.
Reihl: Okay. And you told me earlier that you go to the Alphabet Academy?
Mandy: Uh huh. [Nods head]
Reihl: And that they usually pick you up at school, right?
Mandy: Uh huh. [Nods head]
Reihl: Okay. And did they pick you up Friday?
Mandy: Uh huh. [Nods head]
Reihl: And you went straight to the Alphabet Academy?
Mandy: Uh huh. [Nods head]
Reihl: And say then you what, your mom picks you up from there?
Mandy: Uh huh. [Nods head]
Reihl: Okay. And you said you picked her up about what time?
Monica: Between three thirty and quarter to four.
Reihl: Okay. And you went straight home? Or where’d you go?
Monica: I usually call down there and I watch her walk from there down to our *838 house. And then I waited for my mom and dad to get home, and I went and cashed my check and came home.
Reihl: Okay, when you got home at three thirty, um, did you notice if Rick was at home across the street?
Monica: I didn’t pay no attention. All I saw was Aaron.
Reihl: You saw Aaron?
Monica: Mmm hmm.
Reihl: You don’t remember if Rick’s truck was there?
Monica: No.
Reihl: Okay. And, then Mandy you were telling me that when you got home that was about what time?
Monica: From day care?
Reihl: Yeah.
Monica: That was around three thirty, quarter to four.
Reihl: Okay, and that’s when you saw Aaron?
Mandy: Uh huh. [Nods head]
Reihl: And you saw his dad?
Mandy: Uh huh. [Nods head] His dad, he, his dad was coming from their living room into the kitchen to get something to drink.
Reihl: Did you go over to Aaron’s house or you just saw him from your house?
Mandy: I,'l, üm, when I walked, when I, every day when I walk home I always see Rick walk into the kitchen or walk into the restroom or walk into his room.
Reihl: I mean, did you see him from outside looking in or did you actually go into the house?
Mandy: No, I um seen it from the outside ’cause when ’cause I seen him go into the kitchen. When he came back he had a drink in his — he had, um, some um — I don’t know what it was. He had a drink in his hand but it was in a cup.
Reihl: Okay.
Mandy: Like usually pop, ’cause they like, they like Storm a lot. So, probably Storm. Reihl: What, uh, what does Rick drive? Mandy: A Chevy? He used to drive a Chevy until it broke down.
Reihl: A Chevy what?
Mandy: [Eyes searching, no verbal response]
Reihl: Is it a car or a truck?
Mandy: Truck.
Reihl: What color?
Mandy: Black.
Reihl: Okay.
Mandy: It’s like, kinda short. I mean like it — did you see my mom’s truck? Um, well, uh my mom’s truck, my mom’s truck’s pretty big. His is probably a medium truck, you know. Kinda short.
Reihl: What was he driving Friday? Did you see that?
Mandy: Um, his truck broke down before that. He was drive — driving a white truck which was his brother’s. And his brother had a car so his brother let Rick use the truck.
Reihl: Okay. Was that white truck at Rick’s house Friday?
Mandy: Yeah.
Reihl: When you got home from school? Mandy: Yeah.
Reihl: 'Okay. And this is about what time again?
■ Monica: Three thirty, quarter to four. Reihl: Okay, so between three thirty and quarter to four—
Mandy: Yeah.
*839 Reihl: You saw—
Mandy: Aaron and Rick.
Reihl: Okay, at the house. Did you ever see ’em leave?
Mandy: Um, yeah, like I was on my porch and, and they let me blow bubbles. And I was Mowin’ my bubbles, and I seen Rick pull out and leave.
Reihl: Okay. Now how long, how long after — and this might be hard to guess at — ’cause you probably don’t wear a watch, do you?
Mandy: Well, until my watch, well, yeah I did but. my watch is in my bag and I — ’cause I had to take it off when we had gym. I just take it off.
Reihl: So, about what time do you think they left their house, if you had to guess?
Mandy: Um—
Reihl: I know it’s gotta be a hard question.
Mandy: Um—
Reihl: Was it very long after you got home?
Mandy: Mmm, medium. Because his mom lives pretty far away, you know; And you know but I think it was like — I don’t know.
Reihl: Okay.
Mandy: It was probably in like medium because you know it takes a pretty long time to get to his mom’s house.
Reihl: Well why was he going to his mom’s house. I think he told you, didn’t he?
Mandy: Um, I guess to just visit her.
Reihl: Okay, did he talk about going to his mom’s house?
Mandy: He said that he was going to his mom’s house Friday, "’cause he was gonna stay the night there to go to the field trip Saturday. So it was probably why, and Rick probably wanted to stay a little while to talk. You know, he was, he — he wanted to go on the field trip bad. So, they were gonna leave pretty early to get to the school on time to go. But by the time Saturday when we, when we were on the bus and stuff, he was gonna be in our group, and, um, he never showed up. He wasn’t there. And we didn’t know why. But Saturday — Sunday when we got home with my cousins, um, ’cause we go camp— we went camping after the field trip, we just went, we came back from the field trip, and my mom drove her truck back to the, back up to our house and up to the camper and, and my grandma goes, “Did you see Aaron?” and I’m like, “No, he was supposed to be in our group, he wasn’t there.” And then Sunday, um, my um, my day care teacher said they showed it on TV but my grandpa didn’t get, my grandpa didn’t turn it on there because he, he didn’t know it was they got murdered Friday night. So, I mean, and then Monday, um, Monday, Monday News Center 16 came to my house, and I was at karate ’cause I, I had practice. When we came home my grandma said News Center 16 just, just came to our house like, probably a while ago.
Reihl: So you didn’t get a chance to talk to him then, huh?
Mandy: No.
Reihl: So, Friday, after you got home, they left just a little bit after when you got home, right?
Mandy: Yeah.
Reihl: And you saw ’em leave?
Mandy: Yeah. He pulled out.
Reihl: And they were just together, Rick and Aaron, nobody else with ’em?
*840 Mandy: No one else was with them, just Aaron and Rick.
Reihl: Okay.
Mandy: ’Cause Rick, cause Aaron’s mom — He didn’t know if Aaron’s mom was home yet so Rick was thinking if his mom’s not there, then Wayne’s probably not there. So, he said, “I’ll just drive you,” and they just took off, pulled out and took off.
Reihl: Okay.
Mandy: And—
Reihl: Monica, Monica, I’m sorry.
Mandy: And Fri — and Thur — and when I was playing with them—
Reihl: Mmm hmm.
Mandy: There was, he had some clothes laying on his, laying on his on their swing on the front porch. Um, he had a whole bunch of clothes laying on there and I, I didn’t know what they were for. You know, I thought he was gonna spend the night there Saturday and Sunday, come home Monday. Um, Sunday’s rolling around and he wasn’t there. Saturday, Saturday the field trip, he wasn’t there.
Reihl: Monica, you said something back at your house when I was talking to you about um, you said you’d cashed your check.
Monica: Yeah.
Reihl: Friday?
Monica: Yeah.
Reihl: And that was about what time? Was that after you come home from work?
Monica: Shortly after I came home from work.
Reihl: Okay. And, what time do you think that was?
Monica: Let’s see. Probably about ten minutes till four.
Reihl: Okay. So then you got home then about — how long were you gone to cash the check?
Monica: Probably about fifteen minutes.
Reihl: Okay, and when you got home, that would have put it a little after four o’clock? And was Rick still at the house then? Monica: I didn’t pay no attention. Like I said, all I saw was Aaron. I really didn’t look to see if Rick’s truck was there.
Reihl: Well, Aaron was still there when you got back after you cashed your check? Monica: Yeah.
Reihl: Okay. And you don’t remember if that truck was in the—
Monica: Nuh uh, I didn’t pay no attention. Reihl: Okay, um — You said something, too, didn’t you about you overheard something one time a couple months ago. Monica: Yeah. I don’t, like I said, I don’t know who the woman was. But he was standing, they were standing in their driveway. And, well he was standing in the driveway. She was sitting in the truck. And, uh, I couldn’t hear what she was saying, but he was, you know, he was saying the F-word, and F him, he don’t scare me, and he was just going on and on and on. And then he, then she left, and he just went into the house.
Reihl: This truck, what did it look like?
Monica: It was a, it was a little black truck.
Reihl: Do you know, do you know your vehicles? Do you know the difference between a—
Monica: Well, the lettering on the back was kinda, on the back of it was kinda like, rusted like, and you couldn’t really tell what kind of car it was—
Mandy: Um—
Monica: — what kind of truck.
*841 Mandy: Aarons dad’s truck had Chevy right there. It was just printed beautifully. It was gold and it was just right on there. You could just read it, so it couldn’t have been Aaron, Aaron’s dad’s truck, ’cause Aaron’s dad’s truck was, but, it was still there where he, it broke down. I mean Aaron’s truck’s, dad’s truck was just beautiful. The Chevy was just—
Reihl: But was this was this his ex-wife? Was this—
Monica: I don’t know.
Reihl: — Elizabeth?
Monica: I don’t know who she was. Like I said, all I saw, all I, I never seen the woman. You know, I, I just know that she had blonde hair. Well, I seen her face, but she had blonde hair.
Reihl: Was she a passenger in the truck? Monica: No. She was driving it. '
Reihl: Okay.
Monica: And this was, then I saw her once a little while after that. You know, like a, I don’t know, a couple weeks later. And that was the last time I seen her.
Reihl: What was she driving then?
Monica: Same thing.
Reihl: This truck?
Monica: Mmm hmm. I don’t know, I don’t, like I said I don’t know who she was.
Mandy: Aaron’s mom’s, mom has um, blonde hair.
Reihl: Mmm hmm. I was just trying to see if maybe you could describe this truck. Was there anything, was it, was it a pickup truck where it has the open bed in the back or was it all closed up?
Monica: Uh, let me think. I think it was open. See, ’cause the one that that, ah, Aaron’s dad used to drive had the little things that went down the side.
Reihl: Mmm hmm.
Monica: But it wasn’t all closed in. It just had like little, I don’t know what you’d call ’em, it went from the top all the way to the back of the truck, and it was just a short thing. This one was all open, I believe. I think it was.
Reihl: It was just like a regular pickup truck.
Monica: Yeah.
Reihl: Okay. So it wasn’t like a little sport utility vehicle?
Monica: No.
Reihl: Like you see like one of those Suzuki Samurais or something like that? Monica: No. It was—
Reihl: Kids drive a lot.
Monica: It was pretty rusted.
Reihl: Okay. All right. But you don’t know whether or not that was his—
Monica: No I have no idea.
Reihl: His ex-wife Elizabeth or not? All right.
Monica: I just know that he was highly upset that day.
Reihl: Oh.
Monica: And she didn’t look too happy, and she left and he went into the house.
Reihl: Okay.
Monica: Yeah, I don’t even, I don’t know who his ex-wife is. I mean, it could have been her, but I, I don’t know.
Reihl: Okay. Was there anything else? I can’t remember exactly what all we talked about at the house but, did you say that, uh, I was thinking that you said that Aaron had made some comments to you before, too, about—
Monica: Oh, he just told me the once.
Reihl: Oh.
*842 Monica: He just told me one time that he doesn’t like his stepdad. But, I just figured he was just being a kid.
Monica: You know, “My mom and dad’s divorced but I really don’t like this guy. I don’t want Wayne really to be with my mom. I’d rather, you know, him and my mom be together — ”
Reihl: Mmm hmm.
Monica: “ — than my stepdad,” kinda thing. That’s all I thought it was. So I just really didn’t pay no attention to it.
Reihl: Okay. Okay. All right. Well, just so I got this right then, Mandy, you got home at about three thirty, quarter of four and you saw Aaron and his dad and that white truck at his house?
Mandy: Yes.
Reihl: And then, Monica, you got home from cashing that check around four o’clock or a little after, and you saw them both at the house, or at least you saw Aaron?
Monica: Yeah, I saw Aaron.
Reihl: Okay. But you never saw ’em leave. Monica: No. I was in the house by the time they left.
Reihl: Okay, and Mandy, you did see ’em leave, but you don’t know exactly when it was that they left?
Mandy: Yeah. I seen ’em leave, but, you know I didn’t see no, I didn’t see no bags in the truck. And when, when they left, the clothes were still there.
Reihl: Okay. On the swing?
Mandy: Um, yeah. ’Cause when his grandparents were there, they picked up the clothes and just threw ’em in the box. Reihl: Okay.
Mandy: And we thought that he was moving, like he didn’t like the neighborhood so he was moving. What we thought, and I don’t know if it, I didn’t know if Rick and Aaron Friday were gonna go look for a new house or go to his mom’s. I didn’t know, I thought they were going to look for a new house and then come back, and you know, and go. Like, then go to his mom’s. But, I didn’t, I didn’t know.
Reihl: .Okay. These times that you’ve given me today, uh, these are pretty accurate?
Monica: Mmm hmm. Yeah, ’cause I get off work at quarter after three. And with the traffic and that, and sometimes the South Shore comes by and you gotta wait for that.
Reihl: Mmm hmm.
Monica: So, yeah, pretty well.
Reihl: It’s pretty much a routine that you do every day?
Monica: Yeah.
Reihl: Every day that you work, that is?
Monica: Yeah. Sometimes on, sometimes I have to stay a couple minutes after, so, I get home a little later. And that was just so happen to have been one of the days that was a little bit later.
Reihl: Okay. All right. I, I don’t have any more questions that I can think of at the moment. Do you have anything else that you can think of? Maybe I overlooked, that I have overlooked?
Monica: No. Do you?
Mandy: [Shakes head]
Reihl: I thank you very much for coming down. I’ll take you back home now. The time is, uh, three twenty PM. [Pause] I told you that would take you about fifteen, twenty minutes.
Mandy: [Pointing to ceiling] Is that your camera?
Reihl: It’s up there.
*843 Mandy: Oh, there it is. I thought it was — it’s in that vent right there.

. My colleagues attempt to rehabilitate Kubsch's lawyers in this respect, but they are forced to resort to speculation about what a proper investigation would have revealed. As the Supreme Court has made clear, however, it is essential to evaluate the question whether counsel’s investigation was constitutionally sufficient. See Wiggins v. Smith, 539 U.S. *829 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). There the Court faced a case in which the petitioner's claim "stemfmed] from counsel’s decision to limit the scope of their investigation into potential mitigating evidence.” Id. at 521, 123 S.Ct. 2527. Quoting from Strickland, the Court reaffirmed that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.” Id. In addition, the Court squarely recognized that it is not enough to gather “some ” information. Id. at 527, 123 S.Ct. 2527. In language that applies with equal force to Kubsch’s case, it held that "[i]n assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.” Id. Just so. Kubsch’s lawyers knew about Mandy’s videotaped statement, but that evidence would have led a reasonable attorney to investigate further. Their failure to take that step amounted to constitutionally ineffective assistance.

. As my colleagues point out, Hardy testified against Kubsch in the second trial. By that time they were surely adverse to one another; indeed, it would not be surprising if Hardy’s charges were dropped in exchange for that testimony.